STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2426
    Facsimile: (213) 894-0142
    E-mail: Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>REAL PROPERTY LOCATED IN<br>LOS ANGELES, CALIFORNIA<br><br>        Defendant. | No. 2:22-cv-04950<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>18 U.S.C. § 981(a)(1)(A) and (C)<br><br>[F.B.I.] |

Plaintiff United States of America brings this claim against the above-captioned defendant, and alleges as follows:

**JURISDICTION AND VENUE**

1. This is civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).

2. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(a).

**PERSONS AND ENTITIES**

4. The plaintiff is the United States of America (the "plaintiff" or the "government").

5. The defendant in this action is the Real Property Located in Los Angeles, California (the "Defendant Property").[1] The Defendant Property has Assessor's Parcel Number 2257-001-009, and the following legal description:

> Lot 13, Block 17, of Tract No. 2955, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 31, Page(s)62 et seq in the Office of the County Recorder of said County.

6. Title to the Defendant Property is in the name of Geghetsik Gevorgyan ("Gevorgyan"), Trustee of the Nazik Tunyan Family Trust.

7. The interests of the Nazik Tunyan Family Trust, Tamara Dadyan, Artur Ayvazyan, and MERS, Inc., as nominee for Recovco

---

[1] Pursuant to Local Rule 5.2-1 of the Local Civil Rules for the Central District of California, only the city and state of residential addresses are set forth in this Complaint.

Mortgage Management LLC ("Recovco")[2], may be adversely affected by these proceedings.

## BASIS FOR FORFEITURE

### Summary of the Fraudulent Scheme

8. Beginning in or around March 2020 and continuing through at least in or around August 2020, Richard Ayvazyan ("Ayvazyan"), Artur Ayvazyan, Tamara Dadyan ("Dadyan"), and their co-conspirators (the "Ayvazyan Group") knowingly submitted fraudulent loan applications (the "False Applications") in the names of numerous business entities to lenders, including federally insured financial institutions, and the Small Business Administration (the "SBA"), and in turn, fraudulently obtained proceeds from disaster loans authorized by the Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act.

9. Using altered documents and false information, these False Applications sought to obtain loans guaranteed by the SBA through programs created by the CARES Act, including the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program.

10. The Ayvazyan Group submitted False Applications on behalf of shell corporations, fictitious business entities, as well as real businesses they did not actually own or control. At times, members of the Ayvazyan Group would steal the identities of real persons in order to submit False Applications on these persons' behalf.

---

[2] According to a deed of trust recorded with the Los Angeles County Recorder's Office, numbered 20201017940, Recovco holds a promissory note secured by the Defendant Property in the amount of $1,875,000.00.

3

11. Among other misstatements, the False Applications typically included material misrepresentations about the purported applicant's payroll, payroll taxes, number of employees, and income.

12. Once the funds from a False Application were received, these funds were generally not used for any legitimate business purpose, but instead, would be spent by the Ayvazyan Group on lavish lifestyle expenses, luxury goods such as watches and jewelry, and residential properties.

13. The Ayvazyan Group submitted one such False Application in the name of Anna Dzukeva d/b/a Six Star Farms ("Six Star").

14. Based on this False Application involving Six Star (the "Six Star False Application"), the Ayvazyan Group fraudulently obtained at least $244,500 by way of a PPP loan from lender Newtek Small Business Finance Inc. ("Newtek").

15. Instead of using proceeds of the Six Star False Application for any legitimate business purpose, and in contravention of the rules of the PPP program, the Ayvazyan Group misappropriated the Six Star False Application proceeds for their personal benefit. The Ayvazyan Group did so by, among other means, transferring the proceeds of the Six Star False Application to bank accounts they controlled, which were not business or operations accounts.

16. Among other things, the Ayvazyan Group laundered part of the proceeds of the Six Star False Application through mortgage payments on the Defendant Property.

17. In addition, further investigation has revealed that, in order to transfer title for Defendant Property to Gevorgyan so as to hide the Ayvazyan Group's control over the Defendant Property, the

4

Ayvazyan Group forged numerous title documents for the Defendant Property, including by stealing the identities of at least two notaries public.

### Description of the Paycheck Protection Program

18. The CARES Act is a federal law enacted around March 2020 and designed to provide emergency financial assistance to millions of Americans suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program, or PPP. In or around April of 2020, Congress authorized over $300 billion in additional PPP funding.

19. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business, through its authorized representative, to acknowledge the Program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. One such certification requires the applicant, through its authorized representative, to affirm that:

> [t]he [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges.

20. In addition, the business, through its authorized representative, must state, among other things, the company's number

5

of employees and average monthly payroll expenses, and provide documentation showing the company's payroll expenses. The employee and payroll expense numbers are used to calculate the amount of money the business is eligible to receive under the PPP.

21. In the first instance, the company's PPP loan application is received and processed by a participating financial institution, and then the application is transmitted to the SBA for further review and assessment of the applicant's eligibility. If a PPP loan application is approved, the participating financial institution funds the PPP loan using the financial institution's own monies.

22. PPP loan proceeds must be used by the business on certain permissible expenses, namely payroll costs, interest on mortgages, rent and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least 75% of the PPP loan proceeds on payroll expenses.

A False Application is Submitted for a PPP Loan for Six Star

23. On or about August 13, 2020, Six Star applied for a $244,500 PPP loan through Newtek (the Six Star False Application).

24. Six Star stated in its PPP loan application that Anna Dzukaeva ("Dzukeva") was the applicant and sole owner of Six Star.

25. On or about August 17, 2020, Newtek approved the application and wired $244,500 into a bank account at Capital One Bank in Dzukeva's name with account number ending '1441 ("Account 1441").

26. The government's investigation revealed that the Six Star

False Application contained numerous false and fraudulent representations such as:

    a. Six Star submitted a 2020 IRS Form 941 that claimed to have been prepared by Fard Tax & Accounting, Inc. ("Fard Tax"), which provided a purported PTIN, EIN and business address for Fard Tax. When investigators spoke with the owner of Fard Tax, however, they learned that neither Six Star nor Dzukaeva were ever Fard Tax clients, and that information provided on the Six Star IRS Form 941 did not match what Fard Tax utilizes when preparing legitimate IRS Form 941s for clients.

    b. The Six Star False Application included a California drivers license number A8002470 in the name of Dzukaeva, but California Department of Motor Vehicles ("CADMV") records revealed that this CADMV license number did not exist and there were no records of Dzukaeva held by CADMV.

    c. During the search of Dadyan's residence, investigators discovered a purported California drivers license in the name of Dzukaeva bearing the number A8002470, a checkbook for Account 1441 and handwritten notes for "Anna D. (Capital One) 8/28/20 Currency Balance $383,220."

    d. These facts indicate that the Ayvazyan Group, and specifically Dadyan, were using Dzukaeva's identity to apply for and control accounts in Dzukaeva's name.

<u>The Ayvazyan Group Stole the Identities of Two Notaries Public, and Used These Stolen Identities to Transfer the Defendant Property</u>

27. According to a grant deed recorded with the Los Angeles County Recorder's Office, the Defendant Property was transferred to

Gevorgyan, as Trustee of the Nazik Tunyan Family Trust, on or about August 28, 2020.

28. The transfer of the Defendant Property to the trust was one of a series of transfers intended to disguise the true ownership and control of the Defendant Property by the Ayvazyan Group.

29. To execute these transfers, the Ayvazyan Group stole the identities of multiple California notaries public in order to forge false notarizations on property records, including by stealing the identities of notaries E.N. and R.D. Specifically:

    a. A Deed of Trust signed October 24, 2016 for the Defendant Property identified notary public E.N. on numerous documents recorded with the Los Angeles County Recorder's Office (the "2016 Deed"). The 2016 Deed indicates that Nazik Tunyan, as Trustee of the Nazik Tunyan Family Trust, appeared before E.N. on October 24, 2016 for notarization of the 2016 Deed. The notarization on the 2016 Deed was false, however, and when interviewed by law enforcement, E.N. indicated the that the signature on the notarization was not his, and that his name on the associated stamp was wrong. Additionally, E.N.'s notary book for the date of October 24, 2016 did not indicate that a Nazik Tunyan appeared before him for a notarization on that date.

    b. A Grant Deed and Deed of Trust dated August 19, 2020 for the Defendant Property identified notary public R.D. on numerous documents recorded with the Los Angeles County Recorder's Office (the "2020 Deed"). The 2020 Deed indicates that Gevorgyan, as Trustee of the Nazik Tunyan Family Trust, appeared before R.D. on August 18, 2020 for a notarization of the 2020 Deed. The notarization on the

2020 Deed was false, however, and when interviewed by law enforcement R.D. indicated the that the signature and notary stamp on the document was not his. Additionally, R.D.'s notary book for the date of August 19, 2020, did not indicate that Gevorgyan appeared before him for a notarization on that date.

30.  The identities of notaries public E.N and R.D. were stolen, and when E.N. and R.D. were presented with the 2016 and 2020 Deeds related to the Defendant Property, respectively, each indicated that the signatures and notary stamps on the relevant documents were not theirs and had been used without their authorization.

### Tracing Analysis for the Defendant Property

31.  According to bank statements for Account 1441, the account's opening balance was $330.62.

32.  On August 17, 2020, Newtek deposited $244,500 in fraudulently-obtained PPP loan proceeds into Account 1441.

33.  Between August 18, 2020 and August 27, 2o20, a total of $31,318 was transferred from Account 1441 to Fay Servicing, which was used to make mortgage payments on the Defendant Property.

### The Criminal Action Against Ayvazyan, Dadyan, and Other Members of the Ayvazyan Group

34.  On March 9, 2021, in a First Superseding Indictment, Ayvazyan, Dadyan, and others were charged with violations of 18 U.S.C. § 1349 (Conspiracy to Commit Bank Fraud and Wire Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud and attempted Bank Fraud), 18 U.S.C.§ 1028A (Aggravated Identity Theft), and 18 U.S.C.§ 1956(h) (Money Laundering Conspiracy).

35.  The First Superseding Indictment stemmed from the same

fraud scheme described above.

36.  On or about June 14, 2021, Dadyan pled guilty to violations of 18 U.S.C. § 1349 (Conspiracy to Commit Bank Fraud and Wire Fraud), 18 U.S.C.§ 1028a(a)(1) (Aggravated Identity Theft), and 18 U.S.C.§ 1956(h) (Money Laundering Conspiracy).

37.  Pursuant to Dadyan's plea agreement, she agreed to forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of the illegal activity to which she was pleading guilty, specifically including certain assets, but not limited to those assets listed in the plea agreement.

38.  On June 28, 2021, Ayvazyan and Artur Ayvazyan were convicted of, among other counts, conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

FIRST CLAIM FOR RELIEF

39.  Based on the above, plaintiff United States of America alleges that the Defendant Property constitutes or is derived from proceeds traceable to violations of 18 U.S.C. §§ 1028 (identity theft), 1343 (wire fraud) and 1344 (bank fraud), which are specified unlawful activities, as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1).  The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

SECOND CLAIM FOR RELIEF

40.  Based on the above, plaintiff alleges that the Defendant Property constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957

(relating to money laundering), or property traceable to such property, with the specified unlawful activity being a violation of 18 U.S.C. §§ 1028 (identity theft), 1343 (wire fraud) and 1344 (bank fraud).  The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays:

(a)  that due process issue to enforce the forfeiture of the Defendant Property;

(b)  that due notice be given to all interested parties to appear and show cause why forfeiture should be not be decreed;

(c)  that this Court decree forfeiture of the Defendant Property to the United States of America for disposition according to law; and

(d)  for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: July 20, 2022

STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section

*/S/ Dan G. Boyle*
DAN G. BOYLE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**VERIFICATION**

I, Justin Palmerton, hereby declare that:

1. I am a Special Agent of the Federal Bureau of Investigation.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Verified Complaint for Forfeiture is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed 7/18/2022 , 2022 in Los Angeles, California.

*Justin Palmerton*
JUSTIN PALMERTON
Special Agent
Federal Bureau of Investigation

12