E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
      1400 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone:  (213) 894-2426
      Facsimile:  (213) 894-0142
      E-mail:   Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>             v.<br><br>REAL PROPERTY LOCATED IN LOS ANGELES CALIFORNIA<br><br>             Defendant. | Case No. CV 22-4950-SVW<br><br>DECLARATION OF AUSA DAN BOYLE IN SUPPORT OF MOTION TO STRIKE CLAIMS PURSUANT TO RULE G(8)(c) OF THE SUPPLEMENTAL RULES FOR ADMIRALTY OR MARITIME CLAIMS AND ASSET FORFEITURE ACTIONS |

1

<u>DECLARATION OF DAN G. BOYLE</u>

I, Dan G. Boyle, hereby declare and state as follows:

I have personal knowledge of the following facts and, if called as a witness, would testify thereto under oath.

1.    I am an Assistant United States Attorney in the Central District of California. In my capacity as an Assistant United States Attorney, I am counsel for the government in this action.

2.    Attached as Exhibit 1 is a true a correct copy of claimant Nazik Tunyan Family Trust's special interrogatory responses in this action.

3.    Attached as Exhibit 2 is a compilation of true and correct recorded title documents for the Weddington Property, as recorded by the Los Angeles County Recorder's Office, and produced in this action.

4.    Attached as Exhibit 3 is a true and correct copy of a document filed in <u>United States v. Ayvazyan, et al.,</u> 20-cr-579-SVW, as docket entry 525.

5.    Attached as Exhibit 4 is a true and correct copy of a trial exhibit in <u>United States v. Ayvazyan, et al.,</u> 20-cr-579-SVW, marked as Government's Exhibit 115.

6.    Attached as Appendix A is a copy of <u>United States v Approximately $417,148.06, et al.,</u> Case No. S-99-cv-2456-MLS (E.D.Cal. April 4, 2002).

//
//

1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 2, 2022 in Los Angeles, California.

/s/
DAN G. BOYLE

# EXHIBIT 1

1   JERRY KAPLAN, ESQ. /SBN 49142
2   JOAN KENEGOS, ESQ. /SBN 94015
    **KAPLAN, KENEGOS & KADIN**
3   9150 Wilshire Boulevard, Suite 175
    Beverly Hills, CA 90212
4   Telephone: (310) 859-7700
    Facsimile:  (310) 859-7773
5   Email:      office@3klaw.com
                jkenegos@3klaw.com
6

7   **Attorneys for Claimant**
    *Greta Akoppyan, Trustee of the Nazik Tunyan Family Trust*
8

9

10                **UNITED STATES DISTRICT COURT**

11               **CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13   UNITED STATES OF AMERICA | Case No.: 2:22-CV-04950-SVW-JPR |
| 14              Plaintiff, | **PLAINTIFF'S FIRST SET OF RULE G** |
| 15                  v. | **INTERROGATORIES TO CLAIMANT GRETA AKOPYAN, TRUSTEE, NAZIK** |
| 16 | **TUNYAN FAMILY TRUST** |
| 17   REAL PROPERTY LOCATED IN LOS ANGELES, CALIFORNIA, | **AND RESPONSES THERETO** |
| 18 | |
| 19              Defendant. | |
| 20 | |
| 21   GRETA AKOPYAN, TRUSTEE, NAZIK TUNYAN FAMILY TRUST, | |
| 22 | |
| 23              Claimant. | |

24   PROPOUNDING PARTY:   PLAINTIFF UNITED STATES OF AMERICA

25   RESPONDING PARTY:    GRETA AKOPYAN, TRUSTEE, NAZIK TUNYAN FAMILY TRUST

26   SET NO.:             ONE (1)

27

28

---

**CLAIMANT GRETA AKOPYAN, TRUSTEE, NAZIK TUNYAN FAMILY TRUST RESPONSES TO PLAINTIFF'S FIRST SET OF RULE G INTERROGATORIES**
- 1 -

COMES NOW the Claimant GREATA AKOPYAN, TRUSTEE, NAZIK TUNYAN FAMILY TRUST, and responds to the First Set of Interrogatories of Plaintiff UNITED STATES OF AMERICA as follows:

### PRELIMINARY STATEMENT AND GENERAL OBJECTION

Claimant has not completed its investigation and discovery in this action or preparation for trial. Claimant anticipates that further investigation, discovery, and preparation will disclose further information pertaining to the subject matter of this action, and give new meaning to the information already known to Defendant/Cross-Claimant. These responses are therefore without prejudice to Defendant/Cross-Claimant's right to rely upon any such information at trial or at any other proceeding. Claimant also expressly reserves the right to alter or amend these responses to reflect any such information but assumes no obligation to do so.

Claimant reserves the right to object to the introduction into evidence, at trial or any other proceeding, of any information contained in the following responses to these form interrogatories on any ground, including, without limitation, competence, relevance, materiality, propriety and admissibility. Defendant/Cross-Claimant's responses to these interrogatories are limited to information not protected from disclosure by the Attorney Work-Product Doctrine, the Attorney/Client Privilege, or any other privilege and insofar as the interrogatories calls for any such information, Claimant objects to the form interrogatories on each such ground. Defendant/Cross-Claimant's responses to these form interrogatories are also limited to information which is relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

### RESPONSE TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify all owners of the Defendant Property.

**RESPONSE TO INTERROGATORY NO. 1:**

Nazik Tunyan Family Trust, Revocable Living Trust dated September 25, 2014.

**INTERROGATORY NO. 2:**

Identify the settlor of the Nazik Tunyan Family Trust, and the date that trust was created.

**RESPONSE TO INTERROGATORY NO. 2:**

Nazik Tunyan, September 25, 2014.

**INTERROGATORY NO. 3:**

Identify when you became trustee of the Nazik Tunyan Family Trust, and any documents evidencing the event.

**RESPONSE TO INTERROGATORY NO. 3:**

Responding party became trustee on August 22, 2022 per the Affidavit – Change of Trustee dated August 22, 2022 that was recorded in Los Angeles County, APN 2257-001-009.

**INTERROGATORY NO. 4:**

Identify all previous trustees of the Nazik Tunyan Family Trust, and the date each trustee began and ended that position.

**RESPONSE TO INTERROGATORY NO. 4:**

Geghetsik Gevorgyan, September 25, 2014 – August 21, 2022.

**INTERROGATORY NO. 5:**

Identify the present beneficiaries of the Nazik Tunyan Family Trust.

**RESPONSE TO INTERROGATORY NO. 5:**

Angelina Ayvazyan, 17450 Weddington St., Encino, CA 91316, 818-979-3897

**INTERROGATORY NO. 6:**

Identify any former beneficiaries of the Nazik Tunyan Family Trust.

**RESPONSE TO INTERROGATORY NO. 6:**

Angelina Ayvazyan, 17450 Weddington St., Encino, CA 91316, 818-979-3897

**INTERROGATORY NO. 7:**

Identify all other present assets of liabilities of the Nazik Tunyan Family Trust.

**RESPONSE TO INTERROGATORY NO. 7:**

.      The loan number and mortgage information for the Defendant Property is as follows:

---

**CLAIMANT GRETA AKOPYAN, TRUSTEE, NAZIK TUNYAN FAMILY TRUST RESPONSES TO PLAINTIFF'S FIRST SET OF RULE G INTERROGATORIES**

Lender: Chase Bank; Loan No:  4022424497

**INTERROGATORY NO. 8:**

Identify any present, former, or future consideration you receive as trustee of the Nazik Tunyan Family Trust.

**RESPONSE TO INTERROGATORY NO. 8:**

Responding party has not and will not receive any consideration as trustee of the Nazik Tunyan Family Trust. Angelina Ayvazyan is the sole beneficiary.

**INTERROGATORY NO. 9:**

Identify the role, if any, of Tamara Dayden in the Nazik Tunyan Family Trust.

**RESPONSE TO INTERROGATORY NO. 9:**

Tamara Dayden has no interest or role in the Nazik Tunyan Family.

**INTERROGATORY NO. 10:**

Identify when and how the Nazik Tunyan Family Trust obtained the Defendant Property.

**RESPONSE TO INTERROGATORY NO. 10:**

The Defendant Property was transferred to the Trust Estate per the Nazik Tunyan Family Trust dated September 25, 2014, and by Grant deed recorded with the Los Angeles County Recorder on August 28, 2020 as Instrument No. 20201017939.

**INTERROGATORY NO. 11:**

Identify the role, if any, of Geghetsik Gevorgyan in the Nazik Tunyan Family Trust.

**RESPONSE TO INTERROGATORY NO. 11:**

Geghetsik Gevorgyan was the former Trustee of the Nazik Tunyan Family Trust but has since resigned as Trustee.

**INTERROGATORY NO. 12:**

Describe with particularity the source of your ownership interest in the Defendant Property, and specifically, explain the source(s) of origin(s) of any funds used to purchase the Defendant Property.

**RESPONSE TO INTERROGATORY NO. 12:**

Objection. The question is vague and ambiguous. Without waiving said objection and subject to said objections, Responding Party responds:

Assuming the question is referring to Claimant Greta Akopyan, Trustee of the Nazik Tunyan Family Trust, she has no interest in the Defendant Property. Assuming the question is referring to the Nazik Tunyan Family Trust's interest in the Defendant Property, discovery is ongoing and Responding Party reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 13:**

Identify any loan(s) secured by the Defendant Property. Please describe the terms and purpose of the loan(s) in detail, identify the lenders, identify all documents created in connection with the loans, and describe the nature of the lender's interests in the Defendant Property.

**RESPONSE TO INTERROGATORY NO. 13:**

Chase Bank Loan No. 4022424497 in the amount of $1,875,000.

Discovery is ongoing and Responding Party reserves the right to supplement this response at a later time as appropriate.

Dated: September 27, 2022

**KAPLAN, KENEGOS & KADIN**

/s/ Jerry Kaplan
Jerry Kaplan, Esq.
Attorney for Claimant
*Greta Akopyan, Trustee, Nazik Tunyan Family Trust*

## VERIFICATION

I, GRETA AKKOPYAN, certify and declare that I am the claimant in this action, that I have read the foregoing CLAIMANT GRETA AKKOPYAN, NAZIK TUNYAN FAMILY TRUST'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES and know the contents thereof, and the responses are true and correct to my knowledge, information and belief.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on  09/29/2022 , in  Los Angeles , California ,

_____
Greta Akkopyan, Trustee Nazik Tunyan Family Trust

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 9150 Wilshire Blvd., Suite 175, Beverly Hills, Ca 90212.

On 09/29/2022     I served true copies of the following document(s) described as on the interested parties in this action as follows: CLAIMANT GRETA AKOPYAN, TRUSTEE, NAZIK TUNYAN FAMILY TRUST RESPONSES TO PLAINTIFF'S FIRST SET OF RULE G INTERROGATORIES.

**SEE ATTACHED SERVICE LIST**

BY E-MAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to be sent to the persons at the e-mail addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

DAN G. BOYLE
Assistant United States Attorney
Asset Forfeiture Section
Federal Courthouse, 14th Floor
312 N. Sprint St.
Los Angeles, CA 90012
Daniel.Boyle2@usdoj.gov

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on 09/29/2022         at Beverly Hills, California.

/s/Maria Sandoval
Maria Sandoval

**CLAIMANT GRETA AKOPYAN, TRUSTEE, NAZIK TUNYAN FAMILY TRUST RESPONSES TO PLAINTIFF'S
FIRST SET OF RULE G INTERROGATORIES**
- 7 -

# EXHIBIT 2


▲ **This page is part of your document - DO NOT DISCARD** ▲ 

**05 1133254**

**RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
05/13/05 AT 08:00am**

**TITLE(S) :** 

▲                                              ▲

L E A D   S H E E T

**FEE**

| FEE $10 | H |
|---------|---|
| 2 | |

**D.T.T**
2722.50

11,137.50

NOTIFICATION SENT-$4

**CODE
20**

**CODE
19**

**CODE
9____**

**Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.**          **Number of AIN's Shown**

2257 · 001 · 009                                001

 ▲          **THIS FORM NOT TO BE DUPLICATED**          ▲

USAO_WEDDINGTON_000157

FIDELITY VAN NUYS

RECORDING REQUESTED BY
**FIDELITY NATIONAL TITLE COMPANY**

AND WHEN RECORDED MAIL TO:

Greta Akopyian and Tammy Dadyan
17450 Weddington Street
Encino, CA 91316

Order No.: 19399036
Escrow No.: SSO400664-HA
A.P.N.: 2257-001-009

**05 1133254**

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

**GRANT DEED**

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

DOCUMENTARY TRANSFER TAX IS $2722 50    CITY TRANSFER TAX $11,137.50
[X]    computed on full value of property conveyed, or
[ ]    computed on full value less value of liens or encumbrances remaining at time of sale.
[ ]    unincorporated area      [ X ]  City of **Los Angeles**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
**David Maimon, a married man**

hereby GRANT(S) to **Greta Akopyian, an unmarried woman and  Tamara  Dadyan, a married woman as her sole
and separate property, all as joint tenants**

the following described real property in the County of **Los Angeles**, State of California

  See Exhibit "A" attached hereto and made a part hereof.

Dated   **April 11, 2005**

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES                } SS

On April 11, 2005 _____ before me
Renee Haas
a Notary Public in and for said County and State, personally
appeared David Maimon

_David Maimon_

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies) and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s), acted, executed the instrument.

RENEE HAAS
Commission # 1379833
Notary Public — California
Los Angeles County
My Comm. Expires Oct 13, 2006

WITNESS my hand and official seal.

Signature _____
          Signature of Notary

(This area for official notary seal)
**MAIL TAX STATEMENTS AS DIRECTED ABOVE**

USAO_WEDDINGTON_000158

 

**This page is part of your document - DO NOT DISCARD**



**20161380372**



**Pages:
0005**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**11/07/16 AT 08:00AM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 8,120.00 |
| OTHER: | 0.00 |
| PAID: | 8,151.00 |





**L E A D S H E E T**



**201611070170008**

**00012895604**



**007927672**

**SEQ:
02**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

*E497009*

**P-171189 TR**

RECORDING REQUESTED BY:
Placer Title

AND WHEN RECORDED MAIL TO:

TUNYAN
17450 Weddington Street
Encino, CA 91316

THIS SPACE FOR RECORDER'S USE ONLY:

| Title Order No.: P-171189 | Escrow No.: 27882-NM1 |
| AP#: 2257-001-009  TRA 044     **GRANT DEED** | |

THE UNDERSIGNED GRANTOR(S) DECLARE(S)  *CITY TRANSFER TAX* $6525.00
**DOCUMENTARY TRANSFER TAX is $1,595.00**
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [X] City of  *LOS ANGELES*
FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Greta Akopyan, an Unmarried Woman and Tamara Dadyan, a Married Woman, as her sole and separate
property as Joint Tenants**

hereby GRANT(s) to:
NAZIK TUNYAN, TRUSTEE OF THE NAZIK TUNYAN FAMILY TRUST
DATED SEPTEMBER 25, 2014
the real property in the City of Encino, County of Los Angeles, State of California, described as:     *Los Angeles
LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF
**Also Known as:** 17450 Weddington Street, Encino, CA 91316

Dated September 9, 2016

Greta Akopyan

Tamara Dadyan

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document |
| to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF CALIFORNIA
COUNTY OF _____ Los Angeles _____
On _October 25, 2016_ before me, _Maria Valle_                 A Notary Public
personally appeared _Greta Akopyan and Tamara Dadyan_                 who proved to me on the
basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.
WITNESS my hand and official seal.

MARIA VALLE
Commission # 2002219
Notary Public - California
Los Angeles County
My Comm. Expires Dec 27, 2016

Signature _____     (Seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

# ILLEGIBLE NOTARY SEAL DECLARATION

Government Code 27361.7

I certify under penalty of perjury under the laws of the State of California that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary        MARIA VALLE

Name of County        LOS ANGELES

Date of Commission Expires        12/27/2016

Notary Identification Number        2002219

Signature of person (firm names if any) making verification

Date        10/28/2016

Location        BAKERSFIELD, CA
                 (City)
                 State of California

**This page is part of your document - DO NOT DISCARD**



# 20201017939



**Pages: 0005**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**08/28/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 31.00 |



**L E A D S H E E T**



**202008280160031**

**00018798242**



**011113732**

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

**FSSE-3021900**

*E460070*

**RECORDING REQUESTED BY:**
Fidelity National Title Company

**When Recorded Mail Document and Tax Statement To:**
Geghetsik Gevorgyan
17450 Weddington Street
Encino, CA 91316

SPACE ABOVE THIS LINE FOR RECORDER'S USE

**Escrow Order No.:** FSSE-3021900562

Property Address: 17450 Weddington Street,
Encino, CA 91316
APN/Parcel ID(s): 2257-001-009

Exempt from fee per GC 27388.1 (a) (2); recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier.

## GRANT DEED

**The undersigned grantor(s) declare(s)** *This conveyance transfers an interest into or out of a living trust R+T 11930*

☑ This transfer is exempt from the documentary transfer tax.
☑ The documentary transfer tax is $ _____0_____ and is computed on:
   ☐ the full value of the interest or property conveyed.
   ☐ the full value less the liens or encumbrances remaining thereon at the time of sale.
The property is located in ☑ the **City of Encino**.

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,** Geghetsik Gevorgyan, Trustee of The Nazik Tunyan Family Trust Dated September 25, 2014,

**hereby GRANT(S) to** Geghetsik Gevorgyan, a single woman

**the following described real property in the** City of Encino, County of Los Angeles, State of California:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

**PROPERTY COMMONLY KNOWN AS:** 17450 Weddington Street, Encino, CA 91316

Dated: August 18, 2020

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

_____
Geghetsik Gevorgyan, *Trustee*
*The Nazik Tunyan Family Trust*

## MAIL TAX STATEMENTS AS DIRECTED ABOVE

Grant Deed Out of/In to Trust w/ PCOR
SCA0002378.doc / Updated: 04.08.20

Printed: 08.18.20 @ 06:15 PM
CA-FT-FSSE-01500.080302-FSSE-3021900562

USAO_WEDDINGTON_000183

## GRANT DEED
(continued)

APN/Parcel ID(s):  2257-001-009

> A notary public or other officer completing this certificate
> verifies only the identity of the individual who signed the
> document to which this certificate is attached, and not the
> truthfulness, accuracy, or validity of that document.

State of ___*CA*___

County of ___*Los Angeles*___

On _*8-19-20*_____ before me, _*Roy Dubos*_____, Notary Public,
(here insert name and title of the officer)

personally appeared _*Geghetsik Gevorgyan*_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.

WITNESS my hand and official seal.

_____
Signature

> ROY DUBOS
> Notary Public - California
> Los Angeles County
> Commission # 2226624
> My Comm. Expires Jan 21,2022

## MAIL TAX STATEMENTS AS DIRECTED ABOVE

# NOTARY VERIFICATION

## ILLEGIBLE NOTARY SEAL DECLARATION
### (GOVERNMENT CODE 27361.7)

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary:  ROY DUBOS

Commission Number:  2226624

State:  CALIFORNIA

County:  LOS ANGELES

Date Commission expires:  JANUARY 21, 2022

Place of execution of this Declaration:  **CONCORD, CA**

Date:  8/27/2020

—

By: Victor R. Bell Chicago Title/Fidelity National Title Company



**This page is part of your document - DO NOT DISCARD**



## 20201017941



**Pages:
0005**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**08/28/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 31.00 |



**L E A D S H E E T**



**202008280160031**

**00018798244**



**011113732**

**SEQ:
03**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

*E460070*



**FSSE-302190**

This instrument is filed for record by Fidelity National Title Company
as an Accommodation only. It has not been examined as to its
execution or as to its effect on the Title.

**RECORDING REQUESTED BY:**
Fidelity National Title Company

**When Recorded Mail Document
and Tax Statement To:**
Geghetsik Gevorgyan
17450 Weddington Street
Encino, CA 91316

---

**Escrow Order No.:** FSSE-3021900562

Property Address:  17450 Weddington Street,
                   Encino, CA 91316

APN/Parcel ID(s):  2257-001-009

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Exempt from fee per GC 27388.1 (a) (2); recorded in connection with a transfer of real
property that is a residential dwelling to an owner-occupier.

## GRANT DEED

**The undersigned grantor(s) declare(s)**   *This conveyance transfers an interest into or
out of a living trust R+T 11930*

☑ This transfer is exempt from the documentary transfer tax.
☑ The documentary transfer tax is $_____0_____ and is computed on:
   ☐ the full value of the interest or property conveyed.
   ☐ the full value less the liens or encumbrances remaining thereon at the time of sale.
The property is located in ☑ the **City of Encino**.

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged**, Geghetsik Gevorgyan, a single
woman,

**hereby GRANT(S) to** Geghetsik Gevorgyan, Trustee of The Nazik Tunyan Family Trust Dated September 25, 2014

**the following described real property in the** City of Encino, County of Los Angeles, State of California:

   SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

**PROPERTY COMMONLY KNOWN AS:**  17450 Weddington Street, Encino, CA 91316

Dated:  August 18, 2020

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

_____
Geghetsik Gevorgyan

## MAIL TAX STATEMENTS AS DIRECTED ABOVE

Grant Deed Out of/In to Trust w/ PCOR
SCA0002378.doc / Updated: 04.08.20

Printed:  08.18.20 @ 06:15 PM
CA-FT-FSSE-01500.080302-FSSE-3021900562

USAO_WEDDINGTON_000188

## GRANT DEED
(continued)

APN/Parcel ID(s):  2257-001-009

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____ CA _____

County of _____ Los Angeles _____

On _____ 8-19-20 _____ before me, _____ Roy Dubos _____, Notary Public (here insert name and title of the officer), personally appeared Geghetsik Gevorgyan, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

> **ROY DUBOS**
> Notary Public - California
> Los Angeles County
> Commission # 2226624
> My Comm. Expires Jan 21,2022

## MAIL TAX STATEMENTS AS DIRECTED ABOVE

# NOTARY VERIFICATION

## ILLEGIBLE NOTARY SEAL DECLARATION
### (GOVERNMENT CODE 27361.7)

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary:  ROY DUBOS

Commission Number:  2226624

State:  CALIFORNIA

County:  LOS ANGELES

Date Commission expires:  JANUARY 21, 2022

Place of execution of this Declaration:  **CONCORD, CA**

Date:  8/27/2020

By: Victor R. Bell   Chicago Title/Fidelity National Title Company

USAO_WEDDINGTON_000190

# EXHIBIT "A"
## Legal Description

**For APN/Parcel ID(s):  2267-001-009**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES AREA OF ENCINO, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

Lot 13 Block 17, of Tract No. 2955, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 31 Page(s) 62 et seq. in the office of the County Recorder of said county, described as follows:

Beginning at the Southwesterly corner of said Lot 13; thence along the Southerly line of said Lot, South 89° 44' 43" East 100.00 feet; thence Parallel with the Westerly line of said, Lot, North 0° 04' 00" feet, more or less, to the Southerly line of the Northerly 195.00 feet of said Lot 13; thence along said parallel line North 89° 44' 43" West 84.92 feet to the beginning of a to the beginning of a tangent curve concave Southeasterly, having a radius of 15.00 feet, said curve also being tangent at its Westerly terminus to the Westerly line of said Lot 13;  thence Southwesterly along said curve, an arc distance of 23.56 feet to said Westerly line; thence along said Westerly line, South 0° 04' 00" East 119.96 feet to the point of beginning.

**MAIL TAX STATEMENTS AS DIRECTED ABOVE**



**This page is part of your document - DO NOT DISCARD**



## 20201017940



**Pages:
0020**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**08/28/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 81.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 81.00 |



**L E A D S H E E T**



**202008280160031**

**00018798243**



**011113732**

**SEQ:
02**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

*E460070*

FSSE-3021900002

USAO_WEDDINGTON_000192

**RECORDING REQUESTED BY:**
Fidelity National Title Company

**When Recorded Mail Document and Tax Statement To:**
Recovco Mortgage Management, LLC
90 MERRICK AVE SUITE 430
EAST MEADOW, NY 11554

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Exempt from fee per GC 27388.1 (a) (2); recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier.

DEED OF TRUST

USAO_WEDDINGTON_000193

**When recorded, mail to:**
**Recovco Mortgage Management, LLC**
**90 Merrick Ave**
**Suite #430**
**East Meadow, NY 11554**

**Escrow No.: FSSE-3021900562**
**LOAN #: 2006036891**

──────────────── [Space Above This Line For Recording Data] ────────────────

# DEED OF TRUST

| MIN 1009718-0000035007-0 |
|---|
| **MERS PHONE #: 1-888-679-6377** |

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **August 19, 2020,**                together with all Riders to this document.

**(B) "Borrower"** is **GEGHETSIK GEVORGYAN, A SINGLE WOMAN.**

Borrower's address is **17450 WEDDINGTON ST, Encino, CA 91316.**

Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is **Recovco Mortgage Management, LLC.**

Lender is **a Limited Liability Corporation,**                organized and existing under the laws of **Delaware.**                Lender's address is **4600 Fuller Drive, Suite 300,** **Irving, TX 75038.**

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01          Initials: _GG_
Ellie Mae, Inc.                                    Page 1 of 13                              CAEDEDL  0219
                                                                                             CAEDEDL (CLS)
                                                                                     08/18/2020 11:10 AM PST

USAO_WEDDINGTON_000194

LOAN #: 2006036891

**(D)  "Trustee" is   FIDELITY NATIONAL TITLE COMPANY.**

**(E)  "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)  "Note"** means the promissory note signed by Borrower and dated **August 19, 2020.**            The Note states that Borrower owes Lender  **ONE MILLION EIGHT HUNDRED SEVENTY FIVE THOUSAND AND NO/100* * * *** * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * Dollars (U.S.  **$1,875,000.00**            ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **September 1, 2050.**

**(G)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)  "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)  "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider                ☐ Second Home Rider
☐ Balloon Rider                ☒ Planned Unit Development Rider   ☐ Other(s) [specify]
☐ 1-4 Family Rider             ☐ Biweekly Payment Rider
☐ V.A. Rider

**(J)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)  "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)  "Escrow Items"** means those items that are described in Section 3.

**(N)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)  "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)  "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)  "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**  Form 3005 1/01                    Initials: _GG_
Ellie Mae, Inc.                                          Page 2 of 13                        CAEDEDL  0219
                                                                                            CAEDEDL (CLS)
                                                                                            08/18/2020 11:10 AM PST



USAO_WEDDINGTON_000195

LOAN #: 2006036891

all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County**                                                     [Type of Recording Jurisdiction] of **Los Angeles**                                   [Name of Recording Jurisdiction]:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 2257-001-009**

which currently has the address of    **17450 WEDDINGTON STREET, ENCINO,**

                                                                                                                                      [Street] [City]

California **91316**                          ("Property Address"):
                  [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   **1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3005 1/01            Initials: _6 6_
Ellie Mae, Inc.                                            Page 3 of 13                                                                    CAEDEDL  0219
                                                                                                                                                           CAEDEDL (CLS)
                                                                                                                                           08/18/2020 11:10 AM PST



USAO_WEDDINGTON_000196

to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Initials: _G G_

CAEDEDL  0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST



USAO_WEDDINGTON_000197

**LOAN #: 2006036891**

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

---

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**   Form 3005 1/01

Ellie Mae, Inc. **Page 5 of 13**

Initials: _____

CAEDEDL   0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST



USAO_WEDDINGTON_000198

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.  Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.  Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc.                                        Page 6 of 13

Initials: _GG_____
CAEDEDL   0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST

USAO_WEDDINGTON_000199

LOAN #: 2006036891

from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration

Initials: _GG_

CAEDEDL   0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST



USAO_WEDDINGTON_000200

**LOAN #: 2006036891**

period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc.                                                    Page 8 of 13

Initials:  _G G_

CAEDEDL   0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST

USAO_WEDDINGTON_000201

**LOAN #: 2006036891**

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all

Initials: _GG_

CAEDEDL   0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST



USAO_WEDDINGTON_000202

sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Initials: _6 G_

CAEDEDL   0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST



USAO_WEDDINGTON_000203

**LOAN #: 2006036891**

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: _GG_

CAEDEDL   0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST



USAO_WEDDINGTON_000204

LOAN #: 2006036891

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
**GEGHETSIK GEVORGYAN**                                                                                    DATE

---

**A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

---

**State of CALIFORNIA**

**County of LOS ANGELES**

On ___8 · 19 · 20___, before me, ___Roy Dubos, a notary public___ (here insert name and title of the officer), personally appeared **GEGHETSIK GEVORGYAN**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Roy Dubos___

___Roy Dubos___ (NOTARY)

(SEAL)



ROY DUBOS
Notary Public - California
Los Angeles County
Commission # 2226624
My Comm. Expires Jan 21,2022

---

CALIFORNIA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3005 1/01
Ellie Mae, Inc.                                    Page 12 of 13

Initials: ___G.G___

CAEDEDL  0219
CAEDEDL (CLS)
08/18/2020 11:10 AM PST

USAO_WEDDINGTON_000205

# NOTARY VERIFICATION

## ILLEGIBLE NOTARY SEAL DECLARATION
### (GOVERNMENT CODE 27361.7)

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary:   ROY DUBOS

Commission Number:  2226624

State:   CALIFORNIA

County:  LOS ANGELES

Date Commission expires:  JANUARY 21, 2022

Place of execution of this Declaration:  **CONCORD, CA**

Date:  8/27/2020

By: Victor R. Bell  Chicago Title/Fidelity National Title Company

USAO_WEDDINGTON_000206




**This page is part of your document - DO NOT DISCARD**



# 20190658655



**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**07/09/19 AT 08:00AM**

**Pages:**
**0005**

**PCOR SURCHARGE $20.00**

| | |
|---|---|
| FEES: | 49.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 124.00 |






**L E A D S H E E T**



**201907093280006**

**00016837424**



**009949670**

**SEQ:**
**01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E646114

fsse-3021900207

**FIDELITY NATIONAL TITLE**

**RECORDING REQUESTED BY:**
Fidelity National Title Company

**Escrow Order No.:** FSSE-3021900297

**When Recorded Mail Document To:**
Nazik Tunyan, Trustee
Nazik Tunyan, Trustee of The Nazik Tunyan
Family Trust Dated September 25, 2014
17450 Weddington Street
Encino, CA  91316

APN/Parcel ID(s):  2257-001-009                    SPACE ABOVE THIS LINE FOR RECORDER'S USE

## AFFIDAVIT - CHANGE OF TRUSTEE
(California Probate Code Section 18105)

The undersigned being of legal age, declares under penalty of perjury:

1.   Declarant(s) certifies the existence of the following described Trust and states that he/she/they are the successor Trustee(s) of the following described trust:

      Name of Trust:         NAZIK TUNYAN FAMILY TRUST

      Date of Trust:          September 25, 2014

      Trustor/Settlor(s):    Geghetsik Gevorgyan

      Former Trustee(s):   Nazik Tunyan

2.   The real property held by said trustee/successor trustee is located in the State of California, set forth as follows:

      SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

3.   This Affidavit is prepared and executed pursuant to California Probate Code Section 18105.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

Dated:  June 26, 2019


_____
                   Signature

Nazik Tunyan_____
Print Name

Non-Order Search                          Page 38 of 91        Requested By: Roxanne Visser, Printed: 8/29/2022 4:11 PM
Doc: 2019-658655 AGTSTT 07-09-2019                                              USAO_WEDDINGTON_000039

## AFFIDAVIT - CHANGE OF TRUSTEE
(continued)

APN/Parcel ID(s):  2257-001-009

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _California_

County of _Los Angeles_

Subscribed and sworn to (or affirmed) before me on this 24ᵗʰ day of _June_, 20_19_, by

_Nazik Turhan_

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature                                                                 (Seal)

GOLIE GHOREISHI
Comm. #2230857
Notary Public · California
Los Angeles County
Comm. Expires Feb 10, 2022

Affidavit (Change of Trustee)
SCA00002192 doc / Updated  11 27 17

Page 2

Printed  06.26.19 @ 10 33 AM
CA-FT-FSSE-01500 080302-FSSE-3021900297

Non-Order Search
Doc: 2019-658655 AGTSTT 07-09-2019

Page 39 of 91

Requested By: Roxanne Visser Printed: 8/29/2022 4:11 PM
USAO_WEDDINGTON_000039

# EXHIBIT 3

1   TRACY L. WILKISON
    Acting United States Attorney
2   SCOTT M. GARRINGER
    Assistant United States Attorney
3   Chief, Criminal Division
    SCOTT PAETTY (Cal. Bar No. 274719)
4   CATHERINE S. AHN (Cal. Bar No. 248286)
    BRIAN FAERSTEIN (Cal. Bar No. 274850)
5   Assistant United States Attorneys
    Major Frauds/Environmental and Community Safety Crimes Sections
6        1100/1300 United States Courthouse
         312 North Spring Street
7        Los Angeles, California 90012
         Telephone: (213) 894-6527/2424/3819
8        Facsimile: (213) 894-6269/0141
         E-mail:    Scott.Paetty@usdoj.gov
9                   Catherine.S.Ahn@usdoj.gov
                    Brian.Faerstein@usdoj.gov
10
    DANIEL S. KAHN
11  Acting Chief, Fraud Section
    Criminal Division, U.S. Department of Justice
12  CHRISTOPHER FENTON
    Trial Attorney, Fraud Section
13  Criminal Division, U.S. Department of Justice
         1400 New York Avenue NW, 3rd Floor
14       Washington, DC 20530
         Telephone: (202) 320-0539
15       Facsimile: (202) 514-0152
         E-mail:    Christopher.Fenton@usdoj.gov
16
    Attorneys for Plaintiff
17  UNITED STATES OF AMERICA

18                  UNITED STATES DISTRICT COURT

19             FOR THE CENTRAL DISTRICT OF CALIFORNIA

20  UNITED STATES OF AMERICA,            No. CR 20-579(A)-SVW-4

21           Plaintiff,                  PLEA AGREEMENT FOR DEFENDANT
                                         TAMARA DADYAN
22               v.

23  RICHARD AYVAZYAN,
      aka "Richard Avazian" and
24       "Iuliia Zhadko,"
    MARIETTA TERABELIAN,
25    aka "Marietta Abelian" and
         "Viktoria Kauichko,"
26  ARTUR AYVAZYAN,
      aka "Arthur Ayvazyan," and
27  TAMARA DADYAN,
    MANUK GRIGORYAN,
28    aka "Mike Grigoryan," and

USAO_WEDDINGTON_000117

"Anton Kudiumov,"
ARMAN HAYRAPETYAN,
EDVARD PARONYAN,
  aka "Edvard Paronian" and
      "Edward Paronyan," and
VAHE DADYAN,

        Defendants.

1.     This constitutes the plea agreement between TAMARA DADYAN ("defendant") and the United States Attorney's Office for the Central District of California and the United States Department of Justice, Criminal Division, Fraud Section (collectively referred to herein as "the Offices") in the above-captioned case. This agreement is limited to the Offices and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.     Defendant agrees to:

    a.     At the earliest opportunity requested by the Offices and provided by the Court, appear and plead guilty to **counts 1, 24, and 26** of the first superseding indictment in <u>United States v. Richard Ayvazyan et al.</u>, CR No. 20-579(A)-SVW, which charge defendant with conspiracy to commit wire fraud and bank fraud, aggravated identity theft, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1349, 18 U.S.C. § 1028A(a)(1), and 18 U.S.C. § 1956(h), respectively.

    b.     Not contest facts agreed to in this agreement.

    c.     Abide by all agreements regarding sentencing contained in this agreement.

USAO_WEDDINGTON_000118

1    d.    Appear for all court appearances, surrender as ordered

2    for service of sentence, obey all conditions of any bond, and obey

3    any other ongoing court order in this matter.

4    e.    Not commit any crime; however, offenses that would be

5    excluded for sentencing purposes under United States Sentencing

6    Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

7    within the scope of this agreement.

8    f.    Be truthful at all times with the United States

9    Probation and Pretrial Services Office and the Court.

10    g.    Pay the applicable special assessments at or before

11    the time of sentencing unless defendant has demonstrated a lack of

12    ability to pay such assessments.

13    h.    Ability to pay shall be assessed based on the

14    Financial Disclosure Statement, referenced below, and all other

15    relevant information relating to ability to pay.

16    i.    Defendant agrees that any and all restitution/fine

17    obligations ordered by the Court will be due in full and immediately.

18    The government is not precluded from pursuing, in excess of any

19    payment schedule set by the Court, any and all available remedies by

20    which to satisfy defendant's payment of the full financial

21    obligation, including referral to the Treasury Offset Program.

22    j.    Complete the Financial Disclosure Statement on a form

23    provided by the Offices and, within 30 days of defendant's entry of a

24    guilty plea, deliver the signed and dated statement, along with all

25    of the documents requested therein, to the Offices by either email at

26    usacac.FinLit@usdoj.gov (preferred) or mail to the United States

27    Attorney's Office Financial Litigation Section at 300 N. Los Angeles

28    St., Suite 7516, Los Angeles, CA 90012.

3

USAO_WEDDINGTON_000119

1        k.   Authorize the Offices to obtain a credit report upon

2  returning a signed copy of this plea agreement.

3        l.   Consent to the Offices inspecting and copying all of

4  defendant's financial documents and financial information held by the

5  United States Probation and Pretrial Services Office.

6     3.   Defendant further agrees:

7        a.   To forfeit all right, title, and interest in and to

8  any and all monies, properties, and/or assets of any kind, derived

9  from or acquired as a result of the illegal activity to which

10  defendant is pleading guilty, specifically including, but not limited

11  to, the following:

12        i.   $12,520.00 in U.S. Currency seized during the

13  execution of a federal search warrant on November 5, 2020, in Encino,

14  California, at the residence of defendant and Artur Ayvazyan;

15        ii.  $3,032.23 in bank funds seized pursuant to a

16  federal seizure warrant executed on or about January 22, 2021, from

17  Bank of the West account ending in '0531 in the name of Tamara

18  Dadyan; and

19        iii. $189,430.85 in bank funds seized pursuant to a

20  federal seizure warrant executed on or about January 22, 2021, from

21  Bank of the West account ending in '5682 in the name of Proactive

22  Home Health Care Inc.

23        iv.  Certain real property referred to in the first

24  superseding indictment as Residential Property 1, located at 4910

25  Topeka Drive, Tarzana, in the County of Los Angeles, State of

26  California, APN 2176-029-031;

27        v.   Certain real property referred to in the first

28  superseding indictment as Residential Property 2, located at 834

USAO_WEDDINGTON_000120

Calle La Primavera, Glendale, in the County of Los Angeles, State of
California, APN 5663-036-033; and

vi.  Certain real property referred to in the first
superseding indictment as Residential Property 3, located at 74203
Anastacia Lane, Palm Desert, in the County of Riverside, State of
California, APN 694-331-008(collectively, the "Forfeitable
Property").

(collectively, the "Forfeitable Property").

b.  To the Court's entry of an order of forfeiture at or
before sentencing with respect to the Forfeitable Property and to the
forfeiture of the assets.

c.  That the Preliminary Order of Forfeiture shall become
final as to the defendant upon entry.

d.  To take whatever steps are necessary to pass to the
United States clear title to the Forfeitable Property, including,
without limitation, the execution of a consent decree of forfeiture
and the completing of any other legal documents required for the
transfer of title to the United States.

e.  Not to contest any administrative forfeiture
proceedings or civil judicial proceedings commenced against the
Forfeitable Property.  If defendant submitted a claim and/or petition
for remission for all or part of the Forfeitable Property on behalf
of herself or any other individual or entity, defendant shall and
hereby does withdraw any such claims or petitions, and further agrees
to waive any right she may have to seek remission or mitigation of
the forfeiture of the Forfeitable Property.  Defendant further waives
any and all notice requirements of 18 U.S.C. § 983(a)(1)(A).

5

USAO_WEDDINGTON_000121

f.    Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

g.    Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

h.    To prevent the transfer, sale, destruction, or loss of the Forfeitable Property to the extent defendant has the ability to do so.

i.    To fill out and deliver to the Offices a completed financial statement listing defendant's assets on a form provided by the Offices.

j.    That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

k.    With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property in any proceeding on any grounds including, without limitation, that the forfeiture constitutes an excessive fine or punishment.  Defendant acknowledges that the forfeiture of the Forfeitable Property is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of

USAO_WEDDINGTON_000122

Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea.

### THE OFFICES' OBLIGATIONS

4.  The Offices agree to:

a.  Not contest facts agreed to in this agreement.

b.  Abide by all agreements regarding sentencing contained in this agreement.

c.  At the time of sentencing, move to dismiss the remaining counts of the first superseding indictment and the underlying indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.  At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1.  The defendant understands and agrees that the Offices will not move for a third point for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b), and defendant agrees that a reduction pursuant to U.S.S.G. § 3E1.1(b) for acceptance of responsibility is not appropriate or warranted based on defendant's plea one (1) day prior to trial.

### NATURE OF THE OFFENSES

5.  Defendant understands that for defendant to be guilty of the crime charged in **count one**, that is, Conspiracy to commit wire

USAO_WEDDINGTON_000123

fraud and bank fraud, in violation of Title 18, United States Code, Section 1349, the following must be true:

First, beginning by at least in or about March 2020, and continuing to at least in or about October 2020, there was an agreement between two or more persons to commit at wire fraud, in violation of Section 1343 of Title 18 of the United States Code, and/or bank fraud, in violation of Section 1344(2) of Title 18 of the United States Code; and

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

6.    The objects of the conspiracy charged in count one are wire fraud and bank fraud.  In order for a person to be found guilty of wire fraud, in violation of 18 U.S.C. § 1343, the following must be true:

First, the person knowingly participated in or devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.  Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, another person to part with money or property;

Third, the person acted with the intent to defraud, that is, the intent to deceive and cheat; and

USAO_WEDDINGTON_000124

Fourth, the person used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

In order for a person to be found guilty of bank fraud, in violation of 18 U.S.C. § 1344(2), the following must be true:

First, the person knowingly carried out a scheme or plan to obtain money or property from a financial institution by making false statements or promises;

Second, the person knew that the statements or promises were false;

Third, the statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, a financial institution to part with money or property;

Fourth, the person acted with the intent to defraud; and

Fifth, the financial institution was federally insured.

7.   Defendant understands that for defendant to be guilty of the crime charged in **count 24**, that is, aggravated identity theft, in violation of Title 18, United States Code, Section 1028A(a)(1), the following must be true:

First, defendant knowingly possessed without legal authority a means of identification of another person;

Second, defendant knew that the means of identification belonged to a real person; and

Third, defendant did so during and in relation to bank fraud, in violation of 18 U.S.C. § 1344(2), as charged in count nineteen of the first superseding indictment.  The government need not establish that the means of identification of another person was stolen.

USAO_WEDDINGTON_000125

8.   Defendant understands that for defendant to be guilty of the crime charged in **count 26,** that is, Conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), the following must be true:

First, Defendant agreed with one of more co-conspirators to engage in money laundering, in violation of Section 1956(a)(1)(B)(i) of Title 18 of the United States Code; and

Second, the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it.

9.   The object of the conspiracy charged in count 26 is money laundering, in violation of Section 1956(a)(1)(B)(i) of Title 18.  In order for a person to be found guilty of that offense, the following must be true:

First, the person conducted a financial transaction involving property that represented the proceeds of wire fraud;

Second, the person knew that the property represented the proceeds of some form of unlawful activity; and

Third, the person knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, and/or control of such proceeds.

<u>PENALTIES AND RESTITUTION</u>

10.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1349, as charged in **count one,** is: 30 years' imprisonment; a five-year period of supervised release; a fine of $1,000,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

USAO_WEDDINGTON_000126

11.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1028A(a)(1), as charged in **count 24** of the first superseding indictment, is: two years' imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

12.   Defendant understands that the statutory mandatory minimum sentence that the Court must impose for a violation of Title 18, United States Code, Section 1028A(a)(1), as charged in count 24 of the first superseding indictment, is a two-year term of imprisonment, which must run consecutive to any other sentence of imprisonment, and a mandatory special assessment of $100.

13.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1956(h), as charged in **count 26**, is: 20 years' imprisonment; a three-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

14.   Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 52 years' imprisonment; a 5-year period of supervised release; a fine of $1,750,000 or twice the gross gain or gross loss resulting from

USAO_WEDDINGTON_000127

1  the offenses, whichever is greatest; and a mandatory special

2  assessment of $300.[1]

3      15.  Defendant understands that defendant will be required to

4  pay full restitution to the victims of the offenses to which

5  defendant is pleading guilty.  Defendant agrees that, in return for

6  the Offices' compliance with its obligations under this agreement,

7  the Court may order restitution to persons other than the victims of

8  the offenses to which defendant is pleading guilty and in amounts

9  greater than those alleged in the counts to which defendant is

10 pleading guilty.  In particular, defendant agrees that the Court may

11 order restitution to any victim of any of the following for any

12 losses suffered by that victim as a result: (a) any relevant conduct,

13 as defined in U.S.S.G. § 1B1.3, in connection with the offenses to

14 which defendant is pleading guilty; and (b) any counts dismissed and

15 charges not prosecuted pursuant to this agreement as well as all

16 relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with

17 those counts and charges.  The parties currently believe that the

18 applicable amount of restitution is approximately $18,016,141.26, but

19 recognize and agree that this amount could change based on facts that

20 come to the attention of the parties prior to sentencing.

21     16.  Defendant understands that supervised release is a period

22 of time following imprisonment during which defendant will be subject

23 to various restrictions and requirements.  Defendant understands that

---

25 [1] Defendant understands that there is case law suggesting that
the term of supervised release on **count 24** could be imposed to run
26 consecutively to the term of supervised release imposed on counts one
and 26.  While the Offices do not intend to seek a consecutive term
27 of supervised release, defendant understands that if the Court were
to impose a consecutive term of supervised release, the maximum term
28 of supervised release for the counts of conviction would be eight
years, rather than five years as stated in the text above.

USAO_WEDDINGTON_000128

1    if defendant violates one or more of the conditions of any supervised

2    release imposed, defendant may be returned to prison for all or part

3    of the term of supervised release authorized by statute for the

4    offense that resulted in the term of supervised release, which could

5    result in defendant serving a total term of imprisonment greater than

6    the statutory maximum stated above.

7         17.  Defendant understands that, by pleading guilty, defendant

8    may be giving up valuable government benefits and valuable civic

9    rights, such as the right to vote, the right to possess a firearm,

10   the right to hold office, and the right to serve on a jury. Defendant

11   understands that she is pleading guilty to felonies and that it is a

12   federal crime for a convicted felon to possess a firearm or

13   ammunition.  Defendant understands that the convictions in this case

14   may also subject defendant to various other collateral consequences,

15   including but not limited to revocation of probation, parole, or

16   supervised release in another case and suspension or revocation of a

17   professional license.  Defendant understands that unanticipated

18   collateral consequences will not serve as grounds to withdraw

19   defendant's guilty pleas.

20        18.  Defendant and her counsel have discussed the fact that, and

21   defendant understands that, if defendant is not a United States

22   citizen, the convictions in this case make it practically inevitable

23   and a virtual certainty that defendant will be removed or deported

24   from the United States.  Defendant may also be denied United States

25   citizenship and admission to the United States in the future.

26   Defendant understands that while there may be arguments that

27   defendant can raise in immigration proceedings to avoid or delay

28   removal, removal is presumptively mandatory and a virtual certainty

                                      13

USAO_WEDDINGTON_000129

in this case.  Defendant further understands that removal and
immigration consequences are the subject of a separate proceeding and
that no one, including his/her attorney or the Court, can predict to
an absolute certainty the effect of his/her convictions on his/her
immigration status.  Defendant nevertheless affirms that he/she wants
to plead guilty regardless of any immigration consequences that
his/her pleas may entail, even if the consequence is automatic
removal from the United States.

FACTUAL BASIS

19.  Defendant admits that defendant is, in fact, guilty of the
offenses to which defendant is agreeing to plead guilty.  Defendant
and the Offices agree to the statement of facts provided below and
agree that this statement of facts is sufficient to support pleas of
guilty to the charges described in this agreement and to establish
the Sentencing Guidelines factors set forth in paragraph 21 below but
is not meant to be a complete recitation of all facts relevant to the
underlying criminal conduct or all facts known to either party that
relate to that conduct.

Beginning in or about March 2020, defendant agreed with her
husband, co-defendant Artur Ayvazyan; her brother-in-law, co-
defendant Richard Ayvazyan; her sister-in-law, co-defendant Marietta
Terabelian; her cousin, co-defendant Vahe Dadyan, and others to
submit fraudulent applications for loans through the Paycheck
Protection Program ("PPP") and the Economic Injury Disaster Loan
("EIDL") program to lenders, including federally-insured financial
institutions A, B, C, D, E, G, and H, and non-federally insured
lending institution F, as identified in the first superseding
indictment, and the United States Small Business Administration

14

USAO_WEDDINGTON_000130

("SBA"). The false and fraudulent information defendant agreed with
co-defendants Richard Ayvazyan, Marietta Terabelian, Artur Ayvazyan,
Vahe Dadyan and others to provide to those lenders and the SBA
included: false applicant names, false information about the number
of employees and payroll of the businesses purportedly applying for
the loans, and false information about the owners of the bank
accounts into which the loan proceeds would be deposited, all of
which information was material to the SBA and the lenders.

Defendant and her co-conspirators, Richard Ayvazyan, Artur
Ayvazyan, Marietta Terebelian, and others used and caused to be used
stolen, fictitious, and synthetic identities of other individuals,
including persons out of the country and a dead person, as well as
the names of businesses not controlled by defendant or her co-
conspirators, in order to submit false and fraudulent applications
for EIDL and PPP loans. This information included, but was not
limited to, names used by co-defendant Richard Ayvazyan like "Iuliia
Zhadko," and names used by co-defendant Marietta Terabelian, like
"Viktoria Kauichko." The information also included false and
fraudulent payroll reports and IRS Forms 940 and 941 that purported
to confirm the number of employees and amount of payroll expenses;
false certifications that the loan proceeds would be used for
permissible business purposes; and the names of identity theft
victims, including the names of dead people.

Defendant further conspired and agreed with her husband, Artur
Ayvazyan, to create false and fraudulent documentation in support of
loans, including through the use of templates for creating false and
fraudulent documents that were found on Artur Ayvazyan's phone.
Defendant further admits that records and items found at her

15

USAO_WEDDINGTON_000131

1   residence, at which she lived with co-defendant Artur Ayvazyan,

2   included: fake identification documents; fraudulently obtained credit

3   cards belonging to fake, synthetic and stolen identities including

4   names used to apply for PPP and EIDL loans; checks and checkbooks in

5   the names of individuals and businesses who applied for PPP and EIDL

6   loans; copies of PPP and EIDL loan applications including in her own

7   name and the names of others; and fake and stolen notary stamps and

8   seals belonging to state and federal courts.

9       Defendant submitted and caused to be submitted, and aided and

10  abetted the submission of at least 151 fraudulent PPP and EIDL

11  applications as part of the conspiracy and scheme in which she was a

12  participant along with Richard Ayvazyan, Marietta Terabelian, Artur

13  Ayvazyan, Vahe Dadyan, and others.  Furthermore, text messages

14  obtained from defendant's phone showed that defendant explicitly

15  discussed plans for the conspiracy with co-defendant Richard

16  Ayvazyan, including how to submit PPP and EIDL applications; how to

17  obtain and falsify Employer Identification Numbers ("EINs") for

18  businesses in PPP and EIDL applications; and how to create fake

19  payroll reports.

20      Defendant also agreed with co-defendants Richard Ayvazyan,

21  Marietta Terabelian, Artur Ayvazyan, Vahe Dadyan, and others that the

22  fraudulently obtained loan proceeds would be used to pay for personal

23  expenses and not used to pay for authorized expenses under the PPP

24  and EIDL programs.  In order to make these unauthorized payments,

25  including for personal expenses, defendant agreed with co-defendants

26  Richard Ayvazyan, Marietta Terabelian, Artur Ayvazyan, Vahe Dadyan,

27  and others to cause the fraudulently obtained loan proceeds to move

28  through bank accounts over which defendant and co-defendants Richard

16

USAO_WEDDINGTON_000132

Ayvazyan, Marietta Terabelian, Artur Ayvazyan, and Vahe Dadyan, and others had signatory authority, in order to conceal the true nature and source of the funds flowing through the accounts.

For example, in furtherance of the conspiracy to commit wire fraud and bank fraud, on or about April 22, 2020, defendant, together with co-defendants Richard Ayvazyan, Marietta Terabelian, Artur Ayvazyan, and others, submitted and caused to be submitted to Wells Fargo bank an application in the name of Secureline Realty and Funding, Inc. ("Secureline Realty") seeking a PPP loan in the amount of $122,838, which application: (a) falsely represented that Secureline Realty had eight employees, including employees for whom it had paid wages and payroll taxes; and (b) falsely certified Secureline Realty would use the loan proceeds only for permissible business purposes. On or about May 9, 2020, defendant, together with other co-conspirators, submitted and caused to be submitted to Comerica Bank another application in the name of Secureline Realty seeking a second PPP loan, this one in the amount of $137,500, which application again falsely represented that Secureline Realty had eight employees, including employees for whom it had paid wages and payroll taxes, and falsely certified Secureline Realty would use the loan proceeds only for permissible business purposes.

In reliance on the false statements and representations in the applications, on or about May 7, 2020, Wells Fargo identified as Lender D in the first superseding indictment) deposited, by means of interstate wire, approximately $122,838 into a Wells Fargo bank account in the name of Secureline Realty, and on or about May 11, 2020, Comerica Bank (identified as Lender E in the first superseding

17

USAO_WEDDINGTON_000133

indictment) deposited, by means of interstate wire, $137,500 into a Comerica Bank account in the name of Secureline Realty.

Thereafter, defendant, together with co-defendant Richard Ayvazyan and others, caused a check for approximately $136,000 to be drawn on May 27, 2020, on the Secureline Realty account at Comerica Bank, and a check for approximately $120,010 to be drawn on June 12, 2020, on the Secureline Realty account at Wells Fargo. Defendant, together with co-defendant Richard Ayvazyan and others, caused both checks to be deposited into other bank accounts, including a Bank of America account for Inception Ventures for which co-defendant Richard Ayvazyan was the sole signatory. As defendant knew and agreed, these monies were the proceeds of unlawful activity, and specifically, the PPP and EIDL bank and wire fraud scheme. The defendant and her co-conspirators then wired and caused to be wired these fraud proceeds to Encore Escrow, and co-defendants Richard Ayvazyan and Marietta Terebelian used such proceeds as part of the purchase price of their personal residence on Topeka Avenue, in Tarzana, California.

As another example of the actions taken in furtherance of the conspiracy, defendant agreed with co-defendant Vahe Dadyan to fraudulently apply for a PPP loan in the name of Vahe Dadyan's company Voyage Limo. On May 18, 2020, defendant and her co-conspirators submitted and caused the submission of a PPP loan application to Celtic Bank that falsely stated that Voyage Limo had 11 employees and average monthly payroll expenses of $63,000, and that Voyage Limo would use the loan proceeds solely for business-related purposes. Defendant and her co-conspirators also submitted and caused the submission of fake IRS Forms 940 and 941 to Celtic Bank in support of the PPP loan application. On May 18, 2020, in

USAO_WEDDINGTON_000134

reliance on the false information in the application, Celtic Bank deposited, by means of an interstate wire, $157,000 to a Voyage Limo bank account over which co-defendant Vahe Dadyan had signatory authority.  In furtherance of the conspiracy, on July 3, 2020, co-defendant Vahe Dadyan, working together with the defendant and others, caused $155,000 of the fraudulently obtained PPP loan proceeds to be wired to a Bank of America account in the name of Runyan Tax Services, held in the name of "Viktoria Kauichko," a name defendant knew was used in furtherance of the bank fraud and wire fraud and money laundering conspiracy.  The co-conspirators, including Richard Ayvazyan and Marietta Terebelian, then used these PPP-derived funds as part of a down payment on a property located on Calle La Primavera, in Glendale, California, which was purchased in the name of "Iuliia Zhadko," which the defendant and her co-conspirators knew was used by co-defendant Richard Ayvazyan.

As a further example of the conspiracy, on or about August 13, 2020, defendant and her husband, co-defendant Artur Ayvazyan, submitted via interstate wiring an application for a $244,500 PPP loan to Newtek Small Business Finance in the name of "A.D. DBA Six Star Farms."  Defendant and co-defendant Artur Ayvazyan knew that the application included false information; namely, that the business had 22 employees including employees for whom A.D. paid wages and payroll taxes, and that A.D. would use the loan proceeds only for permissible purposes.  In support of the application, defendant and co-defendant Artur Ayvazyan submitted to Newtek Small Business Finance a California Driver's license purportedly belonging to A.D., and a fake Form 941, which falsely represented that it had been prepared by A.F., a professional tax preparer, and signed by A.D.  Defendant knew

USAO_WEDDINGTON_000135

1   that A.D. and A.F. were real persons.  In truth and in fact, as the

2   defendant well knew, neither A.D. nor A.F. authorized the defendant,

3   co-defendant Artur Ayvazyan, or any of the other co-conspirators to

4   use their names or identifying information.  On or about August 17,

5   2020, in reliance on the false and fraudulent information included in

6   the PPP loan application defendant and co-defendant Artur Ayvazyan

7   had submitted, Newtek Small Business Finance deposited by means of an

8   interstate wire approximately $244,500 to a bank account at Capital

9   One in the name of A.D. that co-defendant Artur Ayvazyan controlled.

10      During the course of the conspiracy and in furtherance of it,

11  defendant and her co-conspirators, Richard Ayvazyan, Marietta

12  Terebelian, Artur Ayvazyan, and others, submitted and caused the

13  submission of approximately 151 PPP and EIDL loan applications

14  containing false and fraudulent information by which they attempted

15  to obtain approximately $21.9 million and did obtain approximately

16  $18,016,141.26.  By submitting materially false and fraudulent

17  documentation in support of the PPP and EIDL loan applications, and

18  by making materially false and fraudulent statements to SBA-approved

19  and FDIC-insured lenders, defendant knowingly, and with the intent to

20  defraud, schemed to obtain, and obtained, funds under the custody and

21  control of Lenders A, B, C, D, E, G, and H, and placed such lenders

22  at risk of financial loss.  The conspiracy was carried out using

23  sophisticated means, including the use of false businesses, stolen

24  identities, a network of bank accounts opened in the names of those

25  false businesses, and the production of fraudulent documents

26  including identity documents.  Indeed, the defendant used coordinated

27  and repetitive steps to carry out and conceal the scheme, including

28  falsifying tax and payroll documents and using bank accounts with

USAO_WEDDINGTON_000136

deceptive names to conceal the nature, location, source, and
ownership of PPP and EIDL loan proceeds.

SENTENCING FACTORS

20. Defendant understands that in determining defendant's
sentence the Court is required to calculate the applicable Sentencing
Guidelines range and to consider that range, possible departures
under the Sentencing Guidelines, and the other sentencing factors set
forth in 18 U.S.C. § 3553(a). Defendant understands that the
Sentencing Guidelines are advisory only, that defendant cannot have
any expectation of receiving a sentence within the calculated
Sentencing Guidelines range, and that after considering the
Sentencing Guidelines and the other § 3553(a) factors, the Court will
be free to exercise its discretion to impose any sentence it finds
appropriate between the mandatory minimum and up to the maximum set
by statute for the crimes of conviction.

21. Defendant and the USAO agree to the following applicable
Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 7 | [U.S.S.G. §§ 2X1,1; 2b1.1(a)(1)] |
| Specific Offense Characteristics | | [U.S.S.G. §§ 2X1,1; |
| Amount of loss >$9,500,000 | +20 | 2B1.1(b)(1)(K)] |
| Sophisticated Means: | +2 | [U.S.S.G. § §§ 2X1,1; 2B1.1(b)(10)(C)] ] |
| Conviction under 18 U.S.C. § 1956 | +2 | [U.S.S.G. § 2S1.1(b)(2)(B) |

Defendant and the Offices reserve the right to argue that additional
specific offense characteristics, adjustments, and departures under
the Sentencing Guidelines are appropriate. Defendant further
understands that the Court must sentence defendant to a term of two

21

USAO_WEDDINGTON_000137

(2) years imprisonment on count 24, which must run consecutive to any term of imprisonment imposed for counts one and 26.

22. Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

23. Defendant and the Offices reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

24. Defendant understands that by pleading guilty, defendant gives up the following rights:

    a.    The right to persist in a plea of not guilty.

    b.    The right to a speedy and public trial by jury.

    c.    The right to be represented by counsel -- and if necessary have the Court appoint counsel – at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

    d.    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

    e.    The right to confront and cross-examine witnesses against defendant.

    f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

22

USAO_WEDDINGTON_000138

g. The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h. Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

25. Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty. Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

26. Defendant agrees that, provided the Court, before imposition of the mandatory consecutive sentence of two (2) years' imprisonment on count 24, imposes a term of imprisonment no more than the high-end of the Sentencing Guidelines range calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any

23

USAO_WEDDINGTON_000139

1  restitution order, provided it requires payment of no more than

2  $18,016,141.26; (f) the term of probation or supervised release

3  imposed by the Court, provided it is within the statutory maximum;

4  and (g) any of the following conditions of probation or supervised

5  release imposed by the Court: the conditions set forth in Second

6  Amended General Order 20-04 of this Court; the drug testing

7  conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the

8  alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

9       27.  The Offices agree that, provided (a) all portions of the

10  sentence are at or above the statutory minimum and at or below the

11  statutory maximum specified above and (b) before imposition of the

12  mandatory consecutive sentence of two (2) years' imprisonment on

13  count 24, the Court imposes a term of imprisonment no less than the

14  low-end of the Sentencing Guidelines range calculated by the Court,

15  the Offices give up their right to appeal any portion of the

16  sentence, with the exception that the Offices reserve the right to

17  appeal the amount of restitution ordered if that amount is less than

18  $18,016,141.26.

19                  RESULT OF WITHDRAWAL OF GUILTY PLEA

20       28.  Defendant agrees that if, after entering guilty pleas

21  pursuant to this agreement, defendant seeks to withdraw and succeeds

22  in withdrawing defendant's guilty pleas on any basis other than a

23  claim and finding that entry into this plea agreement was

24  involuntary, then (a) the Offices will be relieved of all of their

25  obligations under this agreement; and (b) should the Offices  choose

26  to pursue any charge that was either dismissed or not filed as a

27  result of this agreement, then (i) any applicable statute of

28  limitations will be tolled between the date of defendant's signing of

24

USAO_WEDDINGTON_000140

this agreement and the filing commencing any such action; and
(ii) defendant waives and gives up all defenses based on the statute
of limitations, any claim of pre-indictment delay, or any speedy
trial claim with respect to any such action, except to the extent
that such defenses existed as of the date of defendant's signing this
agreement.

### RESULT OF VACATUR, REVERSAL OR SET-ASIDE

29.  Defendant agrees that if any count of conviction is
vacated, reversed, or set aside, the Offices may: (a) ask the Court
to resentence defendant on any remaining counts of conviction, with
both the Offices and defendant being released from any stipulations
regarding sentencing contained in this agreement, (b) ask the Court
to void the entire plea agreement and vacate defendant's guilty pleas
on any remaining counts of conviction, with the Offices and defendant
being released from all their obligations under this agreement, or
(c) leave defendant's remaining convictions, sentence, and plea
agreement intact.  Defendant agrees that the choice among these three
options rests in the exclusive discretion of the Offices.

### EFFECTIVE DATE OF AGREEMENT

30.  This agreement is effective upon signature and execution of
all required certifications by defendant, defendant's counsel, and an
attorney for the Offices.

### BREACH OF AGREEMENT

31.  Defendant agrees that if defendant, at any time after the
effective date of this agreement, knowingly violates or fails to
perform any of defendant's obligations under this agreement ("a
breach"), the Offices may declare this agreement breached.  All of
defendant's obligations are material, a single breach of this

USAO_WEDDINGTON_000141

agreement is sufficient for the Offices to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the Offices in writing.  If the Offices declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas, and (b) the Offices will be relieved of all their obligations under this agreement.

32.  Following the Court's finding of a knowing breach of this agreement by defendant, should the Offices choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.  Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.  Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.  Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

26

USAO_WEDDINGTON_000142

Procedure, or any other federal rule, that the statements or any
evidence derived from the statements should be suppressed or are
inadmissible. Defendant also agrees that any such statements can be
used to cross-examine her should she take the stand at trial of any
co-defendant or in any other matter.

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

OFFICE NOT PARTIES

33. Defendant understands that the Court and the United States
Probation and Pretrial Services Office are not parties to this
agreement and need not accept any of the Offices' sentencing
recommendations or the parties' agreements to facts or sentencing
factors.

34. Defendant understands that defendant and the Offices are
free to: (a) supplement the facts by supplying relevant information
to the United States Probation and Pretrial Services Office and the
Court, (b) correct any and all factual misstatements relating to the
Court's Sentencing Guidelines calculations and determination of
sentence, and (c) argue on appeal and collateral review that the
Court's Sentencing Guidelines calculations and the sentence it
chooses to impose are not error, although each party agrees to
maintain its view that the calculations in paragraph 21 are
consistent with the facts of this case. While this paragraph permits
the Offices and defendant to submit full and complete factual
information to the United States Probation and Pretrial Services
Office and the Court, even if that factual information may be viewed
as inconsistent with the facts agreed to in this agreement, this
paragraph does not affect defendant's and the Offices' obligations
not to contest the facts agreed to in this agreement.

27

USAO_WEDDINGTON_000143

35.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be between the statutory mandatory minimum and the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

36.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the Offices and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//
//
//
//
//
//
//
//
//
//
//
//

28

USAO_WEDDINGTON_000144

1    PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2        37.   The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    TRACY L. WILKISON
     Acting United States Attorney
9

10                                            June 14, 2021

     CATHERINE S. AHN                         Date
11   SCOTT PAETTY
     BRIAN FAERSTEIN
12   Assistant United States Attorneys

13

     DANIEL S. KAHN
14   Acting Chief
     United States Department of Justice
15   Criminal Division, Fraud Section

16   CHRISTOPHER FENTON
     Trial Attorney
17   United States Department of Justice
     Criminal Division, Fraud Section

18

19                                            6-14-21

20   TAMARA DADYAN                            Date
     Defendant

21

22                                            6-14-21

     FRED MINASSIAN                           Date
23   Attorney for Defendant TAMARA
     DADYAN

24

25                 CERTIFICATION OF DEFENDANT

26       I have read this agreement in its entirety.  I have had enough

27   time to review and consider this agreement, and I have carefully and

28   thoroughly discussed every part of it with my attorney.  I understand

                                  29

USAO_WEDDINGTON_000145

1   the terms of this agreement, and I voluntarily agree to those terms.
2   I have discussed the evidence with my attorney, and my attorney has
3   advised me of my rights, of possible pretrial motions that might be
4   filed, of possible defenses that might be asserted either prior to or
5   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),
6   of relevant Sentencing Guidelines provisions, and of the consequences
7   of entering into this agreement. No promises, inducements, or
8   representations of any kind have been made to me other than those
9   contained in this agreement. No one has threatened or forced me in
10  any way to enter into this agreement. I am satisfied with the
11  representation of my attorney in this matter, and I am pleading
12  guilty because I am guilty of the charges and wish to take advantage
13  of the promises set forth in this agreement, and not for any other
14  reason.

15

16  TAMARA DADYAN                                    Date 6/4-21
    Defendant

17

18              CERTIFICATION OF DEFENDANT'S ATTORNEY

19      I am TAMARA DADYAN's attorney. I have carefully and thoroughly
20  discussed every part of this agreement with my client. Further, I
21  have fully advised my client of her rights, of possible pretrial
22  motions that might be filed, of possible defenses that might be
23  asserted either prior to or at trial, of the sentencing factors set
24  forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines
25  provisions, and of the consequences of entering into this agreement.
26  To my knowledge: no promises, inducements, or representations of any
27  kind have been made to my client other than those contained in this
28  agreement; no one has threatened or forced my client in any way to

                              30

USAO_WEDDINGTON_000146

1    enter into this agreement; my client's decision to enter into this

2    agreement is an informed and voluntary one; and the factual basis set

3    forth in this agreement is sufficient to support my client's entry of

4    guilty pleas pursuant to this agreement.

5

6

7    FRED MINASSIAN                      Date

       Attorney for Defendant TAMARA

8    DADYAN

       6-14-21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

# EXHIBIT 4

# Bank Account Records Reviewed (1 of 2)

|  | Account Name | Signatory | Bank | Account # | Open Date | Time Period | | GX # |
|---|---|---|---|---|---|---|---|---|
| 1 | Secureline Realty and Funding Inc | Tamara Dadyan | Comerica Bank | x8935 | 12/05/13 | 01/08/20 | 07/31/20 | 1.d |
| 2 | Secureline Realty and Funding Inc | Tamara Dadyan | Wells Fargo | x1754 | 11/20/14 | 01/13/20 | 07/31/20 | 1.e |
| 3 | Redline Auto Collision Inc | Edvard Paronyan | JPMorgan Chase | x1732 | 04/26/16 | 04/24/20 | 11/30/20 | 1.l |
| 4 | ABC Realty Advisors Inc, Tamara T Dadyan | Tamara Dadyan | JPMorgan Chase | x8366 | 03/07/17 | 05/27/20 | 08/31/20 | 85 |
| 5 | Anna Dzukaeva | Anna Dzukaeva | Capital One | x1441 | 03/21/17 | 01/23/20 | 12/31/20 | 1.s |
| 6 | Marietta Terabelian | Marietta Terabelian | Bank of America | x1475 | 01/16/18 | 03/02/20 | 01/26/21 | 89 |
| 7 | Artashes Grigoryan dba G&A Diamonds | Artashes Grigoryan | US Bank | x1964 | 06/09/18 | 01/01/20 | 11/30/20 | 1.k |
| 8 | Allstate Towing & Transport LLC | Artur Ayvazyan | US Bank | x5135 | 08/12/19 | 04/22/20 | 11/30/20 | 1.j |
| 9 | Voyage Limo LLC | Vahe Dadyan | Wells Fargo | x7900 | 08/20/19 | 03/02/20 | 11/30/20 | 1.m |
| 10 | Iuliia Zhadko | Iuliia Zhadko | Wells Fargo | x8054 | 09/04/19 | 09/01/19 | 06/12/20 | 1.g |
| 11 | Arman Hayrapetyan DBA Sabala Construction | Arman Hayrapetyan | JPMorgan Chase | x9906 | 12/10/19 | 03/02/20 | 11/30/20 | 1.a |
| 12 | Arman Hayrapetyan dba Hart Construction Co | Arman Hayrapetyan | JPMorgan Chase | x1511 | 02/11/20 | 02/11/20 | 05/29/20 | 1.b |
| 13 | Arman Hayrapetyan dba Hart Construction Co | Arman Hayrapetyan | JPMorgan Chase | x9066 | 02/11/20 | 03/03/20 | 05/29/20 | 1.c |

EXHIBIT 115
Page 1 of 12

USAO_WEDDINGTON_000102

# Bank Account Records Reviewed (2 of 2)

| | Account Name | Signatory | Bank | Account # | Open Date | Time Period | | GX # |
|---|---|---|---|---|---|---|---|---|
| 14 | Iuliia Zhadko dba Top Quality Contracting | Iuliia Zhadko | Wells Fargo | x3517 | 03/18/20 | 03/18/20 | 06/12/20 | 1.f |
| 15 | Viktoria Kauichko | Viktoria Kauichko | Wells Fargo | x2085 | 03/19/20 | 03/20/20 | 09/18/20 | 88 |
| 16 | Anton Kudiumov | Anton Kudiumov | Bank of America | x7572 | 05/02/20 | 06/29/20 | 01/21/21 | 86 |
| 17 | Time Line Transport Inc | Iuliia Zhadko | Radius Bank | x0172 | 05/04/20 | 05/04/20 | 09/30/20 | 1.n |
| 18 | Allstate Towing & Transport LLC | Artur Ayvazyan | Bank of America | x7695 | 05/09/20 | 05/11/20 | 09/30/20 | 1.h |
| 19 | Inception Ventures Inc, Richard Ayvazyan | Richard Ayvazyan | Bank of America | x4043 | 06/01/20 | 06/01/20 | 10/31/20 | 87 |
| 20 | Redline Auto Mechanics | Anton Kudiumov | Bank of America | x16271 | 06/23/20 | 06/23/20 | 08/31/20 | 1.o |
| 21 | Runyan Tax Service Inc | Viktoria Kauichko | Bank of America | x9700 | 06/25/20 | 06/25/20 | 08/31/20 | 1.p |
| 22 | Iuliia Zhadko | Iuliia Zhadko | JPMorgan Chase | x6822 | 07/10/20 | 07/20/20 | 01/20/21 | 91 |
| 23 | Mod Interiors Inc | Nazar Terabelian | Radius Bank | x2395 | 07/21/20 | 07/21/20 | 09/30/20 | 1.q |
| 24 | Turing Info Solutions Inc | Iuliia Zhadko | JPMorgan Chase | x5268 | 07/29/20 | 07/29/20 | 01/29/21 | 1.r |

EXHIBIT 115
Page 2 of 12

USAO_WEDDINGTON_000103

# EIDL/PPP Loan Files Reviewed (1 of 2)

|  | Business Applicant | Individual Applicant | Lender | Loan/App # | Amount | GX # |
|---|---|---|---|---|---|---|
| 1 | Allstate Towing and Transport LLC | Artur Ayvazyan | Cross River Bank | X47310 | $  124,000 | 2.f |
| 2 | Anna Dzukaeva dba Six Star Farms | Anna Dzukaeva | Newtek | X8209 | 244,500 | 2.q |
| 3 | Arman Hayrapetyan dba Hart Construction Co | Arman Hayrapetyan | JPMC | X7707 | 112,500 | 6.x |
| 4 | G A Diamonds | Artashes Grigoryan | SBA | X0719 | 150,000 | 2.g |
| 5 | Secureline Realty and Funding Inc | Tamara Dadyan | Wells Fargo | X7709 | 122,838 | 2.d |
| 6 | Hart Construction | Michael Hart | WebBank | X57310 | 130,000 | 2.b |
| 7 | Journeymen Construction | Viktoria Kauichko | SBA | X2210 | 158,000 | 5.c |
| 8 | Mark Zindroski dba Top Quality Contracting | Mark Zindroski | Celtic Bank | X7304 | 113,750 | 6.y |
| 9 | Mark Zindroski dba Top Quality Contracting | Mark Zindroski | Celtic Bank | X7706 | 130,000 | 2.e |
| 10 | Mod Interiors Inc | Nazar Terabelian | Newtek | X8101 | 384,100 | 2.o |
| 11 | Mod Interiors Inc | Nazar Terabelian | SBA | X8350 | 150,000 | 5.m |
| 12 | Redline Auto Collision Inc | Edvard Paronyan | Celtic Bank | X7404 | 130,187 | 2.j |
| 13 | Redline Auto Mechanics | Anton Kudiumov | SBA | X7034 | 159,000 | 5.w |

EXHIBIT 115
Page 3 of 12

USAO_WEDDINGTON_000104

## EIDL/PPP Loan Files Reviewed (2 of 2)

| | Business Applicant | Individual Applicant | Lender | Loan/App # | Amount | GX # |
|---|---|---|---|---|---|---|
| 14 | Redline Auto Mechanics Inc | Anton Kudiumov | Celtic Bank | X8006 | 276,600 | 2.m |
| 15 | Runyan Tax Service, Inc | Viktoria Kauichko | Seattle Bank | X8104 | 276,653 | 2.n |
| 16 | Sabala Construction | Donald Sabala | Cross River Bank | X7303 | 113,750 | 6.a |
| 17 | Sabala Construction | Donald Sabala | WebBank | X7305 | 182,637 | 2.a |
| 18 | Secureline Realty and Funding Inc | Tamara Dadyan | Comerica Bank | X7410 | 137,500 | 2.c |
| 19 | Time Line Transport Inc | Iuliia Zhadko | Newtek AB | X7903 | 122,400 | 6.l |
| 20 | Time Line Transport Inc | Iuliia Zhadko | Celtic Bank | X8007 | 122,400 | 6.j |
| 21 | Time Line Transport Inc | Iuliia Zhadko | SBA | X3854 | 160,000 | 2.l |
| 22 | Top Quality Contracting | Iuliia Zhadko | SBA | X0246 | 118,100 | 6.q |
| 23 | Top Quality Contracting | Iuliia Zhadko | Customers Bank | X7202 | 185,000 | 6.p |
| 24 | Turing Info Solutions | Iuliia Zhadko | SBA | X2336 | 150,000 | 6.s |
| 25 | Turing Info Solutions | Iuliia Zhadko | Newtek | X8210 | 384,100 | 2.p |
| 26 | Voyage Limo | Vahe Dadyan | Celtic Bank | X7400 | 157,500 | 2.k |
| 27 | Redline Auto Collision Inc | Edvard Paronyan | SBA | X5799 | 154,000 | 2.i |

EXHIBIT 115
Page 4 of 12

USAO_WEDDINGTON_000105

# Use of PPP Funds to Purchase Calle La Primavera Property



● **Transaction Amount**
● **PPP Funds**

**PPP Funds Used: $238,614**

**Voyage Limo (Vahe Dadyan)** Wells Fargo X7900

07/03/20 $155,000 $155,000

Celtic Bank PPP LN# X7400

05/20/20 $157,500

Seattle Bank PPP LN# X8104

07/21/20 $276,653

**Runyan Tax Service (Viktoria Kauichko)** BOA X9700

07/23/20 $238,614 $238,614

**Beverly Hills Escrow**

Purchaser: Iuliia Zhadko

Closing Date: 07/27/20

Purchase Price: $1 Million

Source: GX # 2.k, 2.n. 1.m, 1.p, 30

**EXHIBIT 115**
**Page 5 of 12**

USAO_WEDDINGTON_000106



# Use of EIDL/PPP Funds to Purchase Anastacia Lane Property

● **Transaction Amount**
● **EIDL/PPP Funds**

**EIDL/PPP Funds Used: $110,300**

**EIDL APP# X7034** — 06/23/20 to 06/29/20 **$158,900** → **Redline Auto Mech. (Anton Kudiumov) BOA X16271** — 06/29/20 to 07/09/20 $140,000 **$137,410** → **Anton Kudiumov BOA X7572** — 07/09/20 $93,200 **$93,200** → **Perfect Escrow Inc.**

**Liberty SFB PPP LN# X8006** — 06/30/20 **$276,600**

**EIDL APP# X2210** — 05/22/20 **$157,900** → **Viktoria Kauichko BOA X2085** — 06/01/20 $17,100 **$17,100** → 

**Perfect Escrow Inc.**

Purchaser: Viktoria Kauichko

Closing Date: 07/10/20

Purchase Price: $600,000

Source: GX # 5.w, 2.m, 5.c, 1.o, 86, 88, 33, https://www.zillow.com/homedetails/74203-Anastacia-Ln-Palm-Desert-CA-92211/122433189_zpid/

**EXHIBIT 115**
**Page 6 of 12**

USAO_WEDDINGTON_000107

# Use of EIDL/PPP Funds to Purchase Topeka Drive Property



● **Transaction Amount**
● **EIDL/PPP Funds**

**EIDL/PPP Funds Used: $639,807**

**EIDL APP# X3854** — 06/22/20 $149,900 → **Time Line Transport Inc (Iuliia Zhadko)** Radius Bank X0172

**Cross River Bank PPP LN# X47310** — 05/05/20 $124,000 → **Allstate Towing & Transport LLC (Artur Ayvazyan)** US Bank X5135 — 05/21/20 $80,000 → **Allstate Towing & Transport LLC (Artur Ayvazyan)** BOA X7695 — 06/03/20 $93,000 $80,000

**EIDL APP# X0719** — 06/16/20 $144,900 → **G&A Diamonds (Artashes Grigoryan)** US Bank X1964 — 06/19/20 $100,000 → **Marietta Terabelian** BOA X1475 — 06/22/20 $565,000 $249,807

**Celtic PPP LN# X7404** — 05/11/20 $130,187 → **Redline Auto Collision Inc. (Edvard Paronyan)** JPMC X1732 — 06/17/20 $150,000

**EIDL APP# X5799** — 06/08/20 $149,900

**Wells Fargo PPP LN# X7709** — 05/07/20 $122,838 → **Secureline Realty and Funding Inc. (Tamara Dadyan)** Wells Fargo X1754 — 06/12/20 $120,000 → **ABC Realty Advisors Inc. (Tamara Dadyan)** JPMC X8366 — 06/17/20 $200,000 → **Inception Ventures Inc (Richard Ayvazyan)** BOA X4043 — 06/22/20 to 06/24/20 $500,000 $200,000

**Comerica Bank PPP LN# X7410** — 05/11/20 $137,500 → **Secureline Realty and Funding Inc. (Tamara Dadyan)** Comerica Bank X8935 — 05/26/20 $136,000

**Time Line Transport** — 06/24/20 $110,000 $110,000 → **Encore Escrow**

**Encore Escrow**

**Purchasers: Richard Ayvazyan & Marietta Terabelian**

**Closing Date: 06/25/20**

**Purchase Price: $3.25 Million**

Source: GX # 2.l, 2.f, 2.g, 2.j, 2.i, 2.d, 2.c, 1.n, 1.j, 1.k, 1.l, 1.e, 1.d, 1.h, 89, 85, 87, 32

**EXHIBIT 115**
**Page 7 of 12**

USAO_WEDDINGTON_000108



# Other Uses of EIDL/PPP Funds
# May 2020

● **Transaction Amount**
● **EIDL/PPP Funds**

**Celtic PPP LN# X7304**
**Cust. Bk. PPP LN# X7202**
**EIDL APP# X0246**
05/05/20 to 05/19/20 **$416,750**

**Celtic PPP LN# X7706**
05/08/20 **$130,000**

→ **Top Quality Contr. (Iuliia Zhadko)** Wells Fargo X3517

05/05/20 to 05/19/20 $357,000 **$357,000**

→ **Iuliia Zhadko** Wells Fargo X8054

05/06/20 to 05/15/20 $77,699 **$77,699**

→ **Robinhood**

**Webbank PPP LN# X7305**
05/01/20 **$182,637**

**CRB PPP LN# X7303**
05/01/20 **$113,750**

→ **Sabala Const. (Arman Hayrapetyan)** JPMC X9906

05/04/20 $250,000 **$250,000**

**Zion PPP LN# X57310**
**JPMC PPP LN# X7707**
05/01/20 **$242,500**

→ **Hart Constr. (Arman Hayrapetyan)** JPMC X1511

05/04/20 $200,000 **$200,000**

→ **Hart Constr. (Arman Hayrapetyan)** JPMC X9066

05/04/20 $50,000 **$50,000** → **Iuliia Zhadko** JPMC X6994

05/04/20 $50,000 **$50,000** → **Fiber One**

05/04/20 $50,000 **$50,000** → **Anna Manukyan**

Source: GX # 6.y, 6.p, 6.q, 2.e, 2.a, 6.a, 2.b, 6.x, 1.a, 1.b, 1.c, 1.f, 1.g

EXHIBIT 115
Page 8 of 12

USAO_WEDDINGTON_000109



# Other Uses of EIDL/PPP Funds
# June 2020 to September 2020

● **Transaction Amount**
● **EIDL/PPP Funds**

**Newtek PPP LN# X8101** — 07/31/20 **$384,100** →
**Mod Interiors (Nazar Terabelian)** Radius Bank X2395

**EIDL APP# X8350** — 08/07/20 **$149,900** →

08/04/20 to 08/27/20 $74,616 **$74,616** →
**Runyan Tax Service (Viktoria Kauichko)** BOA X9700

08/12/20 $24,858 **$24,858** → **ITALY 2000 IMPORTED FINE FURNITURE**

08/17/20 $100,000 **$100,000** → **BELGIUM NY LLC**

08/20/20 – 09/17/20 $238,960 **$238,960** → **Picadilly Jewelers**

**Liberty PPP LN# X8007 EIDL APP# X3854 Newtek PPP LN# X7903** — 06/30/20 to 07/03/20 **$254,800** →
**Time Line Transport (Iuliia Zhadko)** Radius Bank X0172

07/03/20 – 07/17/20 $82,000 **$82,000** → **Gentleman Timepieces**

**Newtek PPP LN# X8209** — 08/17/20 **$244,500** →
**Anna Dzukaeva** Capital One X1441

08/18/20 – 08/27/20 $31,318 **$31,318** → **FAY SERVICING**

Source: GX # 2.o, 5.m, 6.j, 2.l, 6.l, 2.q, 1.n, 1.p, 1.q, 1.s

EXHIBIT 115
Page 9 of 12

USAO_WEDDINGTON_000110



# Other Uses of EIDL/PPP Funds
# December 2020 to January 2021

● **Transaction Amount**
● **EIDL/PPP Funds**

**EIDL APP# X2336** — 08/12/20 **$149,900** → **Turing Info Solutions (Iuliia Zhadko) JPMC X5268**

**PPP LN# X8210** — 08/25/20 **$384,100** → **Turing Info Solutions (Iuliia Zhadko) JPMC X5268**

12/21/20 $47,000 **$47,000** → **Iuliia Zhadko JPMC X6822**

12/22/20 $86,000 **$86,000** → **Iuliia Zhadko JPMC X6822**

12/23/20 $50,000 **$50,000** → **TD Ameritrade X3630**

12/24/20 $75,000 **$75,000** → **TD Ameritrade X3630**

01/14/21 $22,000 **$22,000** → **coinbase**

Source: GX # 6.s, 2.p, 1.r, 91

**EXHIBIT 115**
**Page 10 of 12**

USAO_WEDDINGTON_000111

# Anna Dzukaeva – X1441 Account Activity
# August 01, 2020 – January 22, 2021

| Transaction Date | Payee/Payor | Deposit Amount | Withdrawal Amount | Balance |
|---|---|---|---|---|
| 08/01/20 | Prior Month Ending Balance | $ - | $ - | $ 184,605.46 |
| 08/04/20 | Fay Servicing | - | 14,566.67 | 170,038.79 |
| 08/17/20 | Newtek Small Business Finance (PPP) | 244,500.00 | - | 414,538.79 |
| *08/18/20* | *Fay Servicing* | *-* | *14,566.67* | *399,972.12* |
| *08/27/20* | *Fay Servicing* | *-* | *16,751.67* | *383,220.45* |
| 08/31/20 | Interest | 23.75 | - | 383,244.20 |
| 08/31/20 | Chrysler Capital | - | 600.00 | 382,644.20 |
| 09/01/20 | Anna Dzukaeva (X3531) | - | 23,000.00 | 359,644.20 |
| *09/15/20* | *ABC Realty Advisors Inc (X2061)* | *-* | *45,000.00* | *314,644.20* |
| *09/24/20* | *Secureline Realty & Funding Inc* | *-* | *48,000.00* | *266,644.20* |
| 09/30/20 | Interest | 26.34 | - | 266,670.54 |
| 10/07/20 | Bed Bath & Beyond | - | 267.08 | 266,403.46 |
| 10/19/20 | Chrysler Capital | - | 600.00 | 265,803.46 |
| 10/23/20 | LA Parking Meter | - | 2.00 | 265,801.46 |
| 10/31/20 | Interest | 22.55 | - | 265,824.01 |
| 11/05/20 | Chrysler Capital | - | 600.00 | 265,224.01 |
| 11/25/20 | Anna Dzukaeva (X3531)(Cashier's Check) | 36,054.05 | - | 301,278.06 |
| 11/25/20 | Fidelity National Title Company | 1,548.20 | - | 302,826.26 |
| 11/30/20 | Interest | 22.16 | - | 302,848.42 |
| 12/28/20 | Chrysler Capital | - | 600.00 | 302,248.42 |
| 12/31/20 | Interest | 25.64 | - | 302,274.06 |
| **01/22/21** | **Ending Balance** | | | **$ 301,674.06** |

Source: GX #1.s

EXHIBIT 115
Page 11 of 12

USAO_WEDDINGTON_000112



**Transactions Between Identified Parties April 2020 to October 2020**

EXHIBIT 115
Page 12 of 12

USAO_WEDDINGTON_000113

# **APPENDIX A**

Case 2:22-cv-04950-SVW-JPR   Document 29-1   Filed 11/02/22   Page 91 of 100   Page ID
#:268
Case 2:99-cv-02456-MLS-DAD   Document 60   Filed 04/04/02   Page 1 of 10

**FILED**

APR – 4 2002

JACK L. WAGNER, CLERK U S DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | CIV. NO. S-99-2456 MLS DAD |
| APPROXIMATELY $417,148.06, ) etc., et al., ) | |
| Defendants. ) | |

**O R D E R**

        This case is presently before the court on plaintiff's
motion for summary judgment.  The court conducted a hearing on this
motion on March 14, 2002, at which Courtney J. Linn, Esq., appeared
on behalf of plaintiff, United States of America; and Bruce Locke,
Esq., appeared on behalf of Viking Trust, the claimant to defendant
approximately $1,100,317.70 in U. S. currency seized from Bank of
America Account No. 08695-01088, and on behalf of Newport Coast
Trust, the claimant to defendant approximately $96,265.61 in U. S.
currency seized from Wells Fargo Bank Account No. 0766-634851.
After considering the parties' written submissions and hearing oral

6D

Case 2:22-cv-04950-SVW-JPR  Document 29-1  Filed 11/02/22  Page 92 of 100  Page ID
#:268
Case 2:99-cv-02456-MLS-DAD  Document 60  Filed 04/04/02  Page 2 of 10

1    argument, the court now renders its decision.[1]

2    **I.        Standard of Review.**

3          Federal Rule of Civil Procedure 56(c) provides that

4    summary judgment is appropriate when the court is satisfied "that

5    there is no genuine issue as to any material fact[2] and that the

6    moving party is entitled to a judgment as a matter of law."

7          In summary judgment practice, the moving party:

8                    always     bears     the    initial
                     responsibility  of  informing  the
9                    district court of the basis for its
                     motion,    and   identifying   those
10                   portions    of    "the    pleadings,
                     depositions,    answers    to
11                   interrogatories, and admissions on
                     file, together with the affidavits,
12                   if   any,"    which   it   believes
                     demonstrate the absence of a genuine
13                   issue of material fact.

14   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R.

15   Civ. P. 56(c)). However, a summary judgment motion "may properly be

16   made in reliance solely on the pleadings, depositions, answers to

17   interrogatories, and admissions on file," without any affidavits, if

18   the nonmoving party will bear the burden of proof at trial on a

19   dispositive issue.  *Id.* at 324.

20

21   [1]     On November 6, 2001, pursuant to a stipulation, this court
     entered final judgment of forfeiture of the other named defendant
22   funds (defendant approximately $417,148.06 in U. S. currency
     seized from Bank of America Account No. 08067-05302, claimed by
23   Amerimax Business Management, Inc., and defendant approximately
     $414,505.34 in U. S. currency seized from Bank of America Account
24   No. 08060-06683, claimed by Owlstone Asset Management, Inc.)  *See*
     Amended Final Judgment of Forfeiture Re: Approx. $417,148.06 in
25   U.S. Currency and Approx. $414,505.34 in U.S. Currency, filed
     November 6, 2001.
26

27   [2]     A fact is "material" if it might affect the outcome of the
     suit under the governing law.  *See* **Anderson v. Liberty Lobby,**
28   **Inc.,** 477 U.S. 242, 248 (1986).

                                    2

Case 2:22-cv-04950-SVW-JPR  Document 29-1  Filed 11/02/22  Page 93 of 100  Page ID
Case 2:99-cv-02456-MLS-DAD  Document 60  Filed 04/04/02  Page 3 of 10
#:270

1          If the moving party meets its initial responsibility, the
2   burden shifts to the nonmoving party to establish the existence of
3   a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e);
4   ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*** 475 U.S. 574,
5   585-86 (1986). The nonmoving party must tender evidence of specific
6   facts in the form of affidavits or admissible discovery material, or
7   both, in support of its contention that a genuine issue of material
8   fact exists. *See* Fed. R. Civ. P. 56(e); ***Celotex,*** 477 U.S. at 324.
9   The evidence of the nonmoving party must be believed, and all
10  reasonable inferences that can be drawn from that evidence must be
11  drawn in favor of the nonmoving party. *See* ***Anderson,*** 477 U.S. at
12  255.

13         The nonmoving party need not establish a material issue of
14  fact *conclusively* in its favor, however. It is sufficient that "the
15  claimed factual dispute be shown to require a jury or judge to
16  resolve the parties' differing versions of the truth at trial."
17  ***First Nat'l Bank v. Cities Serv. Co.,*** 391 U.S. 253, 289 (1968). In
18  other words, the nonmoving party's evidence is sufficient to
19  withstand summary judgment if a reasonable trier of fact could
20  return a verdict in favor of the nonmoving party based on that
21  evidence. *See* ***Anderson***, 477 U.S. at 248.

22  **II.**     **Discussion.**

23         Plaintiff, United States, is presently moving for summary
24  judgment seeking forfeiture of the funds seized from Bank of America
25  Account No. 08695-01088 and Wells Fargo Account No. 0766-634851.
26  The Viking Trust has filed a claim to the funds seized from Bank of
27  America Account No. 08695-01088, and the Newport Coast Trust has
28  filed a claim to the funds seized from Wells Fargo Bank Account No.

Case 2:22-cv-04950-SVW-JPR   Document 29-1   Filed 11/02/22   Page 94 of 100   Page ID
Case 2:99-cv-02456-MLS-DAD   Document 60   Filed 04/04/02   Page 4 of 10
#:271

1  0766-634851.  *See* Amended Claims to Property, filed May 1, 2000.

2  Plaintiff asserts two arguments in favor of granting its
3  summary judgment motion: (1) the trusts lack Article III standing,
4  and (2) the trusts have no cognizable interest in the funds that
5  they are claiming.  In the present case, an analysis of whether the
6  trusts have standing, plaintiff's first argument, essentially
7  includes an analysis of whether the trusts have a cognizable
8  interest, plaintiff's second argument.  As discussed below, the
9  court finds that the claimants, Viking Trust and Newport Coast
10  Trust, do not have standing to litigate the merits of the forfeiture
11  of the defendant funds because they are sham trusts and, thus, the
12  funds seized from the two bank accounts should be forfeited to the
13  United States.

14  Article III, section 2, clause 1 of the United States
15  Constitution requires a case or controversy for a federal court to
16  have jurisdiction.  The United States Supreme Court has found that
17  the doctrine of standing is a core component of the case or
18  controversy requirement.  *See **Lujan v. Defenders of Wildlife**,* 504
19  U.S. 555, 559-60 (1992).

20  To have standing, a party must demonstrate three elements.
21  *See **id.*** at 560-61.  The first element is the party must have
22  experienced a concrete and particularized injury as to a legally
23  protected interest that is either an actual injury or an imminently
24  threatened injury.  *See **id.*** at 560.  The second element for standing
25  is the plaintiff must show a causal connection between the
26  defendant's conduct and the injury.  *See **id.*** at 560-61.  The third
27  element is the requested relief must be likely to redress the
28  injury.  *See **Wedges/Ledges of California, Inc. v. City of Phoenix**,*

4

Case 2:22-cv-04950-SVW-JPR   Document 29-1   Filed 11/02/22   Page 95 of 100   Page ID
#:272
Case 2:99-cv-02456-MLS-DAD   Document 60   Filed 04/04/02   Page 5 of 10

1 | 24 F.3d 56, 61 (9th Cir. 1994); *United States v. Hays*, 515 U.S. 737,

2 | 742 (1995).

3 | The key element in the present case is the first element,

4 | requiring a concrete and particularized injury to an interest of the

5 | claimant.   The Ninth Circuit has found that a claimant in a

6 | forfeiture action has the burden of demonstrating that it "owns or

7 | has an interest in the forfeited property."   *United States v. One*

8 | *Parcel of Land, Known as Lot 111-B*, 902 F.2d 1443, 1444 (9th Cir.

9 | 1990).   The claimant needs to be the true owner of the property to

10 | challenge the forfeiture; it cannot be a nominal owner.   *See United*

11 | *States v. Vacant Land*, 15 F.3d 128, 130 (9th Cir. 1993).   To

12 | determine whether a claimant is the true owner, the court looks to

13 | whether the claimant exercised dominion and control over the

14 | property.   *See id.*   "'[P]ossession of mere legal title by one who

15 | does not exercise dominion and control over the property is

16 | insufficient even to establish standing to challenge a forfeiture.'"

17 | *One Parcel of Land, Known as Lot 111-B*, 902 F.2d at 1444 (quoting

18 | *United States v. A Single Family Residence*, 803 F.2d 625, 630 (11th

19 | Cir. 1986); *United States v. One 1945 Douglas C-54 (DC-4) Aircraft*,

20 | 604 F.2d 27, 28 (8th Cir. 1979)).

21 | As for the injury component of this element, the Supreme

22 | Court has defined "particularized injury" as one that affects the

23 | party "in a personal and individual way," and has explained that an

24 | imminently threatened injury is one that is "*certainly* impending."

25 | *Lujan*, 504 U.S. at 561 n.1, 564 n.2 (emphasis in original).

26 | /////

27 | /////

28 | /////

Case 2:22-cv-04950-SVW-JPR  Document 29-1  Filed 11/02/22  Page 96 of 100  Page ID
Case 2:99-cv-02456-MLS-DAD  Document 60  Filed 04/04/02  Page 6 of 10
#:272

1              In the present case, the first element can be reduced to
2  the following two questions:  (1) do the trusts have a true
3  ownership interest in the defendant funds, and (2) have the trusts
4  suffered an actual injury or are the trusts threatened by an
5  imminent injury as to their interest in the defendant funds.  Both
6  of the above questions are answered in the negative because, as
7  shown below, the trusts are sham trusts.

8              Restatement (Second) Trusts, § 61 (1959) provides that
9  "[a]n intended trust . . . is invalid if the performance of the
10  trust . . . involves the commission of a criminal or tortious act by
11  the trustee."  Here, Lester Simmons, a trustee of both the Viking
12  Trust and the Newport Coast Trust, used the trusts for tax evasion
13  purposes and, thus, the trusts are invalid trusts/sham trusts.

14              As proof, the court relies on Lester Simmons' admission --
15  that the trusts were shams -- which was made in a federal criminal
16  action, *United States of America v. Lester Simmons*, CR. No. S-00-126
17  EJG.[3]  *See* Exhibit E to Pl.'s Req. for Jud. Notice, pp. 18:19-20:18.
18  Specifically, when Lester Simmons pled guilty to one count of tax
19  evasion, Lester Simmons admitted the conduct described in the
20  probation officer's pre-sentence report.  *See* id.  The pertinent
21  conduct described in the probation officer's pre-sentence report can
22  be found in paragraphs 5 and 6 as follows.  "The funds in the
23  Eulenstein bank account [Bank of America Account No. 08695-01088,
24  currently claimed by the Viking Trust] were used to purchase real
25

26  [3]   On September 18, 2001, the judge in the federal criminal
27  action ordered that plaintiff could use and disclose ¶¶ 3-8, 16
of the presentence report in the parallel civil forfeiture
28  action, which is presently before this court.  *See* Exhibit F to
Pl.'s Req. for Jud. Notice, filed September 27, 2001, pp. 1-2.

Case 2:22-cv-04950-SVW-JPR  Document 29-1  Filed 11/02/22  Page 97 of 100  Page ID
Case 2:99-cv-02456-MLS-DAD  Document 60  Filed 04/04/02  Page 7 of 10
#274

1 | property in Lester Simmons' name and in the name of trusts for which

2 | he had total control.  Simmons attempted to disguise and conceal his

3 | ownership by utilizing the trusts."  Exhibit F to Pl.'s Req. for

4 | Jud. Notice at Ex. B, ¶ 5.

5 |          In 1999, Lester Simmons purchased a property in
         Newport Beach, California, for $1,900,000.
6 |          This property was also purchased in the name of
         another trust [Newport Coast Trust].  Lester
7 |          Simmons devised a very complex scheme to funnel
         the money between several accounts with it
8 |          finally ending in the trust account to be later
         transferred to the escrow company.  In February
9 |          2000, Lester Simmons transferred the title from
         the trust to himself and then sold the property
10 |          for $2,050,000.

11 | Id. at ¶ 6.

12 |          Furthermore, even claimants' opposition admits that the

13 | trusts were shams:

14 |          [I]t is clear that Mr. Simmons transferred
         funds to his daughter's grand-parents [sic] and
15 |          had the grand-parents [sic] sign documents
         creating the trusts, name Mr. Simmons as
16 |          trustee, and name his daughter and her mother
         [sic] the beneficiaries.  Since this activity
17 |          was arranged by Mr. Simmons, Mr. Simmons
         correctly admitted that the trusts are 'shams,'
18 |          or 'alter egos' of Mr. Simmons for income tax
         purposes.

19 |

20 | Claimants' Opp., p. 5.

21 |          Based on the foregoing, the claimants, Viking Trust and

22 | Newport Coast Trust, were indeed sham trusts and, thus, do not have

23 | a true ownership interest in the defendant funds, thereby precluding

24 | standing for the trusts to contest the forfeiture of the defendant

25 | funds.

26 | /////

27 | /////

28 | /////

7

Case 2:22-cv-04950-SVW-JPR  Document 29-1  Filed 11/02/22  Page 98 of 100  Page ID
Case 2:99-cv-02456-MLS-DAD  Document 60  Filed 04/04/02  Page 8 of 10
#:275

1     Moreover, the court finds that the trusts also do not have

2  standing because they have not experienced any injury, and are not

3  threatened by an imminent injury because the trusts are shams and,

4  thus, do not exist.  As plaintiff argued, "[t]hat which does not

5  exist, and never did exist, cannot be harmed by any judgment entered

6  in this case."[4]  Pl.'s Reply, p. 3.

7  **III.     Conclusion.**

8     The claimant trusts do not have standing to contest the

9  forfeiture of defendant funds because they are shams and, thus: (1)

10 they do not have a true ownership interest in the defendant funds

11 (approximately $1,100,317.70 in United States currency seized form

12 Bank of America Account No. 08695-01088 and approximately $96,265.61

13 in United States currency seized from Wells Fargo Bank Account No.

14 0766-634851), and (2) they have not experienced any injury, and are

15 not threatened by an imminent injury, because they do not exist.

16     Accordingly, IT IS ORDERED that:

17     (1)  Plaintiff's motion for summary judgment is GRANTED;

18          and

19     (2)  Within ten (10) days from the date of this Order,

20          plaintiff shall lodge with the Clerk of the Court a

21          Final  Judgment  of  Forfeiture  providing  that  all

22          right,  title  and  interest  in  the  approximately

23          $1,100,317.70 in United States currency seized from

24          Bank  of  America  Account  No.  08695-01088  and  the

25

26 [4]  The court is unable to accept as reasonable or logical the
   arguments that Bruce Locke, counsel for claimants, has advanced,
27 which he contends establish that the trusts created, in this
   case, are not "suable entities" or that the court should view
28 Lester Simmons as the claimant to the defendant funds.

approximately $96,265.61 in United States currency
seized from Wells Fargo Bank Account No. 0766-634851
is forfeited to the United States of America, to be
disposed of as provided by law.

DATED: April 4, 2002.

                                    UNITED STATES DISTRICT JUDGE

Case 2:22-cv-04950-SVW-JPR   Document 29-1   Filed 11/02/22   Page 100 of 100   Page ID
#:277
Case 2:99-cv-02456-MLS-DAD   Document 60   Filed 04/04/02   Page 10 of 10

United States District Court
for the
Eastern District of California
April 4, 2002


* * CERTIFICATE OF SERVICE * *


2:99-cv-02456


USA

   v.

$417,148.06

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  April 4, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


      Clare K Nuechterlein                CL/MLS
      United States Attorney
      501 I Street                       MG/DAD
      Suite 10-100
      Sacramento, CA  95814

      Courtney J Linn
      United States Attorney
      501 I Street
      Suite 10-100
      Sacramento, CA  95814

      Bruce Locke
      Bruce Locke Attorney at Law
      555 University
      Suite 170
      Sacramento, CA  95825


                              Jack L. Wagner, Clerk

                              BY: _____
                              Deputy Clerk